**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Douglas B. COLE, James Hawkins, James Hensley, Carl Holley, Defendants-Appellants.**

No. 82–5225.

United States Court of Appeals, Eleventh Circuit.

May 2, 1983.

Alfonso C. Sepe, Miami, Fla., for Cole & Hawkins.

Mark A. Pizzo, Asst. Fed. Public Defender, Robert W. Knight, Tampa, Fla., for Hensley.

Patrick D. Doherty, Clearwater, Fla. (Court-appointed), Marc Cooper, Miami, Fla., for Holley.

John Steele, Jacksonville, Fla., Lee William Atkinson, Tampa, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, RONEY, Circuit Judge, and PITTMAN *, District Judge.

GODBOLD, Chief Judge:

All appellants were convicted in a bench trial of conspiracy to violate the Travel Act, 18 U.S.C. Sections 371 & 1952. Holley, Hawkins, and Hensley were also convicted of substantive violations of the Travel Act, 18 U.S.C. Section 1952. Cole and Holley were convicted of violating the Mann Act, 18 U.S.C. Section 2421. The convictions all arose from operation of an interstate prostitution enterprise. The convictions of all appellants are affirmed.

*Background*

Appellants, along with Kenneth Hart [1] and Jerry Owens,[2] were active members of the Tampa (Florida) Chapter of the Outlaw Motorcycle Club. To join the Outlaws one must be male, own a Harley-Davidson motorcycle, and embrace the Outlaw lifestyle.

The Tampa Outlaws are an insular group with members living at or near their clubhouse, occupying themselves primarily with their motorcycles, touring, and "partying". Gainful employment among the Outlaws is rare.

Women closely associated with the Outlaws are termed "patched old ladies" and sport insignia, sometimes tattoos, proclaiming them "Property of Outlaws." These women are treated as "property" by the Outlaws. At a given time an individual woman is typically associated with a particular Outlaw. But she may be sold, traded, or given to another. Unlike the males, the women are expected to work—sometimes as waitresses, dancers, barmaids—often as prostitutes. An "old lady's" duties to the man with whom she is associated include giving him her money and following orders without question. Mostly the women are compliant in all this; if not, compliance may be enforced with physical violence.

In the spring of 1979, Mary Carley was living at the Outlaw clubhouse in Tampa with Kenneth Hart as his "old lady" and supplying Hart's income by working locally as a prostitute. But local work became difficult. She was out on bond from a firearms charge, and the local police were cracking down on prostitution. Through Lori, another "old lady," she and Hart learned of the Club Caprice, a brothel in Meridian, Mississippi. Lori, Carley and Hart telephoned the club owner and arranged jobs there for Carley and Lori.

The two women went to Meridian and began work at the club. Lori was fired soon after for misconduct. Carley continued to work there but didn't like working alone. She called Hart and asked him to send some other "old ladies" to join her. Soon afterwards two more Outlaw women arrived from Tampa. Carley worked intermittently at the Club Caprice for more than a year, joined at different times by various Outlaw women including those associated with Hawkins, Cole, Hensley, and Owens. During that year she was traded by Hart and became Holley's "old lady." At times some of the men came to Meridian to see the women, and phone calls were exchanged between the women in Meridian and the men in Florida.

* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. Hart was tried with appellants and convicted of conspiracy to violate the Travel Act and substantive violations of the Travel Act. He did not appeal.

2. Owens was named in the original indictment along with appellants. Pursuant to a plea agreement he became a witness for the prosecution, and the indictment as to him was dismissed.

At times Carley and the other women would return to Tampa. When this occurred Carley would personally deliver her prostitution proceeds to her "old man." Other times Hart, and later Holley, would telephone Carley asking for money, and she would wire the money via Western Union. She also instructed other Outlaw women on how to send money back to the men and on occasions accompanied them to the Meridian Western Union office.

At trial Carley was the government's primary witness. Much of her testimony was corroborated by the owner of the Club Caprice and to a lesser extent by Outlaw member Owens. Documentary evidence from Western Union confirmed that the Outlaw women wired money from Meridian across state lines to Hawkins, Holley, Hensley, Cole, Owens, and Hart.[3]

### I. *Single v. multiple conspiracies*

Appellants contend the indictment, which charged a single conspiracy involving multiple defendants, varies fatally from the proof which at best, they say, revealed several conspiracies. They urge that no unifying agreement was proved and each man-woman pair should be viewed as a conspiracy unto itself.

■ In determining whether there is a common design the nature and effect of the scheme is not to be judged by dismembering it but rather by looking at it as a whole. *Park v. Huff,* 506 F.2d 849, 859 (5th Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). The conspiracy here is similar to that in *U.S. v. Clemones,* 577 F.2d 1247, *modified,* 582 F.2d 1373 (5th Cir.1978) (a prostitution ring composed of a changing cast of pimps and their prostitutes); and that in *U.S. v. Perez,* 489 F.2d 51 (5th Cir.1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974) (different teams of people staged automobile collisions in various parts of Louisiana for the common purpose of defrauding insurers).

■ Various Outlaw women were dispatched by the men to Meridian at different times to work in the Club Caprice as prostitutes. While there each woman wired money back to her associated male. Some man-woman pairs changed membership; other pairs floated in and out of the ongoing operation. The intermittent nature of the enterprise was shaped by the desires and financial needs of the participants. That the appellants did not share the money received with each other does not negate the existence of a single conspiracy where as here a mutually beneficial scheme is shown. *See U.S. v. Alvarez,* 610 F.2d 1250, *vacated in part en banc,* 625 F.2d 1196 (5th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981). An agreement to conspire may be inferred from the acts of the parties and other circumstantial evidence. *U.S. v. Berry,* 644 F.2d 1034, 1039 (5th Cir.1981). While association alone will not support an inference of a conspiracy, the association of the appellants may be considered as a factor. Viewing the evidence in the light most favorable to the government, there was sufficient evidence of one overall conspiracy that each appellant joined.

---

**3.** Western Union documents show the following interstate wire transfers made from Meridian:

| Date | To | From | Amount |
|---|---|---|---|
| 8/4/79 | Hart | Mary Money * | $1000 |
| 8/10/79 | Hart | Mary Money * | 300 |
| 8/14/79 | Hart | Gloria Hedges | 850 |
| 3/3/80 | Holley | Mary Saxton * | 350 |
| 3/7/80 | Holley | Mary Saxton * | 160 |
| 3/7/80 | Owens | Helen Owens | 200 |
| 3/10/80 | Cole | Karen King | 120 |
| 3/15/80 | Owens | Helen Owens | 170 |
| 3/22/80 | Owens | Helen Owens | 150 |
| 3/24/80 | Holley | Mary Saxton * | 350 |
| 4/2/80 | Holley | Mary Saxton * | 500 |
| 4/9/80 | Holley | Mary Saxton * | 400 |
| 4/11/80 | Hawkins | Leah Eiring | 1200 |
| 4/18/80 | Holley | Mary Saxton * | 200 |
| 4/20/80 | Hawkins | Leah Eiring | 500 |
| 4/26/80 | Holley | Mary Saxton * | 100 |
| 5/27/80 | Hawkins | Leah Eiring | 600 |
| 5/30/80 | Holley | Mary Saxton * | 175 |
| 5/30/80 | Hensley | Brenda Lupton | 180 |
| 6/2/80 | Holley | Mary Saxton * | 150 |
| 6/5/80 | Hensle (sic) | Brenda Lupton | 270 |
| 6/5/80 | Hawkins | Leah Ering (sic) | 500 |

* Carley was also known as Mary Money and Mary Saxton.

Most of the wire transfers were made to Tampa. The Hedges-Hart transfer was to Detroit, Michigan where Hart and other Outlaws were attending a funeral. The remainder went

## II. *"Distribution" and the "thereafter" clause*

Appellants challenge the conspiracy and substantive Travel Act convictions maintaining there was no proof that after the money was wired to them a distribution of proceeds under subparagraph (1) of the Act occurred or was intended. The Travel Act states:

Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

18 U.S.C. Section 1952(a). The indictment here alleged the use of Western Union facilities as the interstate act. The "thereafter" act alleged was distribution of proceeds per subparagraph (1).

Travel Act cases typically rely on a subparagraph (3) act as the "thereafter" act rather than subparagraph (1) as here. *U.S. v. Lightfoot,* 506 F.2d 238 (D.C.Cir.1974) is the rare subparagraph (1) case. In *Lightfoot* a pimp using proceeds of prostitution purchased a car in Maryland and then drove it to Washington, D.C. The issue was whether the act of buying the car was a subparagraph (1) "distribution." The court held it was not, reasoning that distribution does not encompass the concept of buying an article in the normal course of trade. *Id.* at 241. The court looked to the dictionary

definition of "distribution" and concluded that in the context of the Travel Act:

[T]he word "distribute" carries a connotation of distribution of illegal proceeds to persons in organized crime conspiracies. Certainly the person receiving them must be entitled to them for reasons other than normal and otherwise lawful purchase and sale of goods at market prices.

*Id.* at 242.

Appellants contend the evidence here is the same as in *Lightfoot* since there was no evidence that the individual males after picking up the money at Western Union passed it on to cohorts. Appellants say that they like Lightfoot put the money to individual use after the interstate act. Appellants are correct that no distribution was proved after they picked up the money at Western Union. There was, however, a series of woman-to-man "distributions" here. The sticking point is whether distribution occurred after the use of the interstate facility. The government urges that the acts by the men of picking up the money at the Western Union office supplied the "thereafter" acts of distribution. Although cases, mainly drug cases, discussing the act of distribution often use the word "transfer," which could refer to either the transferor's or the transferee's act, it is the act of handing over rather than the act of receiving that is the prohibited act. *See e.g., U.S. v. Dovalina,* 525 F.2d 952 (5th Cir.), *cert. denied,* 425 U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 197 (1976) (co-defendant's handing of cocaine to government agent in accordance with defendant's direction amounted to a distribution); *U.S. v. Ramirez,* 608 F.2d 1261 (9th Cir.1979) (defendant's sharing cocaine he possessed on a noncommercial basis with friends was a distribution).

■ Under 18 U.S.C. Section 2,[4] however, appellants are responsible as principals for

---

to other Florida locations where the men were attending bike runs.

4. The indictment specified that criminal responsibility for all substantive Travel Act violations was based on 18 U.S.C. Section 2 which provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or

the handing over itself. When the women wired the money they hired Western Union as their agent to perform several acts: first to transfer the money across state lines and then to hand it over to the addressee males. As each act occurred it was the act of the woman through Western Union as her innocent agent. *See Pereira v. U.S.,* 202 F.2d 830, 837 (5th Cir.1953), *aff'd,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). As the primary movers or persons in charge, the men commanded, induced or procured the women to act as they did through Western Union. Thus as principals under 18 U.S.C. Section 2, each act of the women through Western Union was the act of the men. When Western Union handed over the money to appellants in Florida distribution occurred, and this distribution took place, as the Act requires, after the interstate transfer. The handing over in Florida was no less a distribution because it was triggered by the command of the distributee males themselves. The men's entitlement to the money did not spring from normal and lawful reasons. The men were requiring the women to use Western Union as the means to "hand over" the illegal proceeds of their joint criminal enterprise to the men in Florida. The result is the same that would obtain if the women, at the direction of the men, had physically traveled to Florida and personally delivered the prostitution proceeds to the men.

### III. *Cole's sufficiency of the evidence challenge*

Cole maintains the evidence was insufficient to prove he knowingly aided, abetted, counseled or procured the transportation of women across state lines for the purposes of prostitution in violation of 18 U.S.C. Sections 2 and 2421.

■ To aid or abet one must associate with the venture in some way and participate in it as something one wishes to bring about. *Moore v. U.S.,* 356 F.2d 39 (5th Cir.1966). Conduct that amounts to counseling or inducing the prohibited activity can support a conviction for aiding or abet-

another would be an offense against the Unit-

ting. *Grimes v. U.S.,* 379 F.2d 791 (5th Cir.), *cert. denied,* 389 U.S. 846, 88 S.Ct. 104, 19 L.Ed.2d 113 (1967).

In February 1980, Holley instructed Carley to go to Mississippi to work. Karen King and Helen Owens both planned to go with Carley. King was Cole's "old lady" at the time. Before the trip both Cole and Jerry Owens discussed the trip with Carley. Cole inquired about the money to be made there. The three women traveled in Helen Owens' car to Meridian, worked there as prostitutes for about three months, and wired money back to the men in Tampa.

■ Cole's prior knowledge of the purpose of the trip, his financial interest in its prospective success, and his receipt of prostitution proceeds provide sufficient evidence from which the district court could conclude beyond a reasonable doubt that he aided or abetted the women's interstate travel.

AFFIRMED.

ed States, is punishable as a principal.