UNITED STATES of America,
Plaintiff-Appellee,

v.

Wilson Tony HARRELL, James Hawkins, Anthony Scire, Karl Heinz Harig, Defendants-Appellants.

No. 82–3057.

United States Court of Appeals,
Eleventh Circuit.

July 30, 1984.

Rehearing and Rehearing En Banc Denied Sept. 21, 1984.

John P. Gaudiosi, Pompano Beach, Fla., for Anthony Scire.

**974**

Robert Stuart Willis, Jacksonville, Fla., for Harrell.

Mark P. Bryan, Federal Public Defender, Tampa, Fla., for Hawkins.

Kerry H. Brown, Tampa, Fla., for Harig.

Lee William Atkinson, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.

Before FAY, VANCE and HATCHETT, Circuit Judges.

VANCE, Circuit Judge:

For the second time in just over a year, we review convictions involving the Tampa chapter of the Outlaws Motorcycle Club.[1] Three of the four appellants in this case—James Hawkins, Wilson Tony Harrell, and Karl Heinz Harig—were color-wearing members of the chapter. Harrell (a/k/a "Roadblock" or "R.B.") was the chapter's apparent chief, while Hawkins ("Hawk") served as one of his top lieutenants and Harig ("Slow Karl") was a member of the rank-and-file. Tony Scire, who lived in Hia-

leah, Florida, allegedly supplied the chapter with cocaine for redistribution.

The prosecutions stem from a far-flung Outlaws drug distribution ring operated out of Tampa and Harrell's nearby lakehouse. All four appellants were convicted on Count One, conspiracy to possess with intent to distribute cocaine, methaqualone, and/or amphetamine and methamphetamine. Harrell and Hawkins were also found guilty on Counts Two (possession with intent to distribute cocaine) and Three (a Travel Act violation); Hawkins and Scire were found guilty on Count Six (possession with intent to distribute cocaine). Harig was acquitted on the latter count. We reverse Hawkins' conviction on Count Three. Finding no merit in the remaining contentions, we otherwise affirm.[2]

## I. SUFFICIENCY OF THE INDICTMENT

The opening round of this appeal commences with a sixth amendment challenge to the indictment on grounds of vagueness, pressed by Harrell and Harig. Their fire is trained mainly on Count One, the conspiracy charge.[3]

---

1. In *United States v. Cole*, 704 F.2d 554 (11th Cir.1983), we affirmed the conviction of James Hawkins, among others, for offenses stemming from the operation of an interstate prostitution ring.

2. We have been aided little, if at all, by the government's brief, which substitutes abstract platitudes and conclusory statements for factual discussion and legal analysis.

3. Count One reads as follows:

 *Count One*

 From on or about January, 1978 to on or about December 1981, the exact dates being to the Grand Jury unknown, at Tampa, in the Middle District of Florida, and elsewhere, the defendants

 WILSON TONY HARRELL, a/k/a "Roadblock"
 JOHN JOSEPH HALL, a/k/a "J.J."
 JAMES HAWKINS, a/k/a "Hawk"
 LEONARD BRAUND
 PAUL WILLIAM GRABER, a/k/a "Mouse"
 ANTHONY "Tony" SCIRE
 KARL HEINZ HARIG, a/k/a "Slow Karl"

 knowingly, willfully and unlawfully did conspire, combine, confederate and agree among themselves and with others both known and

unknown to the grand jury to possess with the intent to distribute certain controlled substances, including:

 (a) cocaine, a Schedule II controlled substance and narcotic drug;
 (b) methaqualone, a Schedule II controlled substance and
 (c) amphetamine and methamphetamine, a Schedule II controlled substance,

 in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

 It was a part of the manner and means by which this conspiracy was to be carried on and its objectives accomplished that at all times material hereto:

 (1) defendants Hall, Hawkins and Harrell initiated, organized, planned, directed, managed and supervised their co-conspirators in a pattern of controlled substance dealings;
 (2) the participants in this conspiracy were members of, or associated with, the Outlaw Motorcycle Club, and as such members, these participants paid dues to the club and owed the club certain loyalties, debts and services;
 (3) monies received as a result of controlled substances dealings were used to pay dues to, expenses of, and otherwise support the existence of and activities of, the club,

■ We begin by observing that an indictment will pass constitutional muster: if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.

*Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *see Russell v. United States*, 369 U.S. 749, 761, 82 S.Ct. 1038, 1045, 8 L.Ed.2d 240 (1962). An indictment that tracks the wording of the statute under which an offense is charged will meet these constitutional requirements if the language sets forth the essential elements of the crime, *Hamling*, 418 U.S. at 117, 94 S.Ct. at 2904, and adequately specifies the time, place and participants involved, *United States v. Ramos*, 666 F.2d 469, 474 (11th Cir.1982). Furthermore, an indictment for conspiracy need not be as specific as an indictment for a substantive count. *United States v. Yonn*, 702 F.2d 1341, 1348 (11th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 283, 78 L.Ed.2d 261 (1983).

■ In *Yonn*, an indictment of virtually identical specificity survived a motion to dismiss. *See* 702 F.2d at 1348; *see also Ramos*, 666 F.2d at 474–75. Because we are unable to make a principled distinction between this case and *Yonn*, we conclude that appellants' salvo misses its mark.[4]

The next volley, a set of related discovery objections, merits only brief mention. Appellants complain that they did not receive a bill of particulars until seven working days before trial. Given the trial court's substantial discretion to deny a bill of particulars altogether, we discern no reason for complaint on appellants' part. This is especially true since the trial court's broad discretion is reversible only for actual surprise, *United States v. Hawkins*, 661

including the payment of legal fees for participants who faced criminal charges;
(4) controlled substances were supplied to club members for "partying", as a means of rewarding and promoting loyalty to the club and its criminal purposes;
(5) violence and threats of violence were used to further the business of trafficking in controlled substances, to insure the loyalty and silence of participants in the conspiracy, and to punish club members who broke club discipline.
All in violation of Title 21, United States Code, sections 841(a)(1) and 846.
We need not reach Harrell's objections to the sufficiency of the counts of which he stands acquitted, Counts Four and Five.

4. The specific deficiencies that appellants perceive are mere phantoms. Although Count One correctly recounts the period January 1978 to December 1981 as the time span of the conspiracy, Harrell argues that this time frame, by virtue of its sheer length, rendered the count vague. Harrell does not deny, however, that the government adduced proof implicating him in the conspiracy throughout the entire 48-month period. Nor was the time allegation fatally open-ended, as was the case in *United States v. Cecil*, 608 F.2d 1294 (9th Cir.1979). *See United States v. Tavelman*, 650 F.2d 1133, 1137 (9th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982).

Cohort Harig argues that the 48-month time span was vague with respect to him because the only proof against him concerned a four-month period in 1981. It is settled in this circuit, however, that proof of any date before the return of the indictment and within the statute of limitations, within reason, precludes a variance. *United States v. Grapp*, 653 F.2d 189, 195 (5th Cir. Unit A 1981). While the indictment was not the model of precision, we cannot say that the allegation was so vague as to require dismissal.

Appellants insist that the government was required under *United States v. Diecidue*, 603 F.2d 535 (5th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980), to allege the particular acts comprising the conspiracy. It is the law of this circuit, however, that no overt acts in furtherance of a conspiracy need be alleged in order to survive a motion to dismiss. *United States v. Marable*, 578 F.2d 151, 154 (5th Cir.1978). The specificity that *Diecidue* requires is only that detail necessary to set forth the elements of the offense charged, as opposed to the evidentiary details establishing the commission of the crime. 603 F.2d at 547. That was done here.

Appellants' argument that Count Three contains an inadequate allegation of location is equally misguided. In *Yonn* we approved an indictment that alleged criminal activity "in the Northern District of Florida and elsewhere." 702 F.2d at 1348. In light of that holding, we discern no deficiency in Count Three, which alleged travel in violation of the Travel Act "from the Middle District of Florida to Oklahoma City, Oklahoma."

F.2d 436, 451–52 (5th Cir. Unit B 1981), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982); *United States v. Davis*, 582 F.2d 947, 951 (5th Cir.1978), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979), which appellants do not allege. Likewise, appellants were not entitled under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to a list of government witnesses or a list of statements attributed either to the defendants or to other co-conspirators in the absence of a claim that such information was exculpatory. *United States v. Davis*, 487 F.2d 112, 122 (5th Cir.1973), *cert. denied*, 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878 (1974).

## II. SEVERANCE

■ Harig urges that the trial court erred in refusing his motion for severance under Fed.R.Crim.P. 14. His burden on review is a heavy one. Denial of severance under Rule 14 is within the broad discretion of the trial court and is reversible only for abuse of that discretion. *United States v. DeSimone*, 660 F.2d 532, 539 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982). Because any joinder works a certain degree of inherent prejudice, denial of severance is subject to reversal only if the defendant musters proof that compelling prejudice flowed from the joinder. *United States v. Bright*, 630 F.2d 804, 813 (5th Cir.1980).

■ Harig downplays his role in the unfolding conspiracy, describing himself as a "bit player". As a first ground for severance, he argues that he suffered compelling prejudice from the spillover effect of the far greater proof introduced against his co-defendants. A disparity in the quantum of proof, however, justifies severance only in the most extreme cases, as when a cautionary instruction could not furnish a cure. *United States v. Johnson*, 713 F.2d 633, 640 (11th Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984). This is not such a case. The verdict, which

acquitted Harig of Count Six, firmly demonstrated the jury's ability to sift through the evidence and render the individualized determination of Harig's guilt that obviated severance. *See United States v. Zicree*, 605 F.2d 1381, 1389 (5th Cir.1979), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980).

■ Nor did co-defendant Hawkins' offer to testify for Harig at a separate trial require a different outcome. The defendant who asserts a need for a co-defendant's testimony must establish the following predicate to demonstrate compelling prejudice requiring severance:

> (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the co-defendant will in fact testify if the cases are severed.

*United States v. Duzac*, 622 F.2d 911, 912 (5th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980). In support of his motion for severance, Harig submitted an affidavit signed by Hawkins that stated:

> The affiant has agreed and will be available to testify as a witness on behalf of Karl Heinz Harig as long as my constitutional rights are not jeopardized. I would be available in a separate trial and willing to testify as long as I am not on trial at the same time. If called during a joint trial, I will invoke my Fifth Amendment right to remain silent but in a separate trial would most likely testify. My testimony would be exculpatory in nature and would be relevant to the issue of innocence of KARL HEINZ HARIG. I will testify that KARL HEINZ HARIG has had no involvement with any controlled substance transactions.

These wisps of allegations are no less bare or conclusory than those that failed in *DeSimone*, 660 F.2d at 539–40. We therefore hold that the trial court was well within its sound discretion to deny Harig's motion for severance.[5]

5. Harig also argues that the trial court should have excluded damaging evidence because, ac-

cording to Harig, the evidence was seized on the basis of a false tip provided by an unreliable

## III. EVIDENTIARY RULINGS

Harrell and Harig freely admit that they were full-fledged members of the Tampa Outlaws Motorcycle Club, an organization that Harrell confesses is "virtually synonymous with criminal misconduct." On appeal, they level the lance of their allegiance at the government, charging that its introduction of vivid testimony portraying the often bizarre existence of the Outlaws was an unlawful attempt to prove their guilt by association. Appellants alternatively challenge the testimony as evidence of specific acts that was probative only of their propensity to commit crime, in violation of Fed.R.Evid. 404(b).[6]

At trial the government read the jury Count One of the indictment, which detailed allegations concerning the manner and means of the conspiracy charged. Testimony elicited at trial supported these allegations. Onetime Outlaw Jerry Luke Owens, when asked how he supported himself during his membership in the club, replied, "Same as anybody else, drugs and women." He admitted that no man in the Outlaw fraternity held a legitimate job and that the members instead lived off the profits of drug sales and the income their girlfriends and wives, better known as "old ladies", earned from forced prostitution.

Several former Outlaws who turned government witness testified to the violence and threats of force that were used to assure their silence. Paul Clendening,

for one, decided to break off from the club a week after he was forced to move into the Outlaws' clubhouse because he "got tired of getting beat up on and pushed around and all kind of stuff like that." When asked to identify the initials "G.F.O. D.", Clendening, echoed by witness William Barnes, replied: "God forgives; Outlaws don't." According to Clendening, the slogan referred to the Outlaws' Hammurabian code of an eye for an eye and a tooth for a tooth. As a consequence, both Clendening and Barnes joined the federal witness relocation program in fear for their lives. On the stand, Barnes openly admitted that he had donned a false beard and dark glasses for his appearance at trial because he specifically feared Harrell's revenge. Melanie Platt, who became Harrell's "old lady" at age fourteen, testified that he once pummelled her after she ran away from him.

The government disputes that the above evidence constitutes proof of other crimes, wrongs or acts committed by Harrell, Harig or both so as to come within the purview and thus the restrictions of Rule 404(b). It matters little, however, whether the rule encompasses the challenged testimony, since the evidence was ultimately used to "enhance the trier's understanding of the event, and not to prove propensity." 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[10] at 404–61 (1982); *see United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir.1983).[7]

---

informant and a search warrant that failed to specify adequately the room to be searched. We find no factual or legal merit in his contentions.

**6.** In *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), this court enunciated the following two-part test for determining the admissibility of proof of extrinsic offenses: (a) the extrinsic evidence must be relevant to an issue other than the defendant's character; (b) the probative value of the evidence must not be substantially outweighed by its undue prejudice and the evidence must meet the other requisites of Rule 403. *Id.* at 911.

**7.** Although his brief is not entirely clear, it appears that Harrell predicates his evidentiary challenge solely on initial admissibility and does not argue that the probative value of the

evidence adduced was substantially outweighed by undue prejudice for purposes of Rule 403.

Harig argues that he was unjustifiably prejudiced when the government read certain portions of Count One to the jury. He first charges that paragraph 3 of Count One, which alleges that drug sale receipts were used to finance legal fees for participants who faced criminal charges, falsely imputed to Harig a prior arrest or criminal record. We disagree. The essence of the allegation was that some Outlaws, but not necessarily Harig, incurred legal fees that the club sought to pay. Harig's second objection to this passage is more substantial. He argues that the allegation impugned the credibility of defense counsel and therefore hampered its effectiveness by implying that counsel's pockets were lined with drug money. We conclude, however, that any doubt cast on defense counsel's integrity to Harig's prejudice was substantially out-

We have no difficulty concluding that the testimony of the Outlaws' way of life was important in understanding the existence, motives and object of the drug-trafficking conspiracy and the means through which it was conducted. *Cf. United States v. Arias-Diaz*, 497 F.2d 165, 170 (5th Cir. 1974), *cert. denied*, 420 U.S. 1003, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). To explain these adequately, the government needed to establish that the Outlaw club and its members depended on drug revenues for their livelihood; that the club required an influx of new members to maintain its drug trafficking operations; and that it retained the loyalty and silence of old members with rewards of drugs on the one hand and intimidation on the other. The testimony of Outlaws practices was unquestionably admissible for these purposes. *See Mills*, 704 F.2d at 1558–59; *United States v. Larson*, 526 F.2d 256, 259 (5th Cir.), *cert. denied*, 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 106 (1976); *United States v. Hughes*, 441 F.2d 12, 19–20 (5th Cir.), *cert. denied*, 404 U.S. 849, 92 S.Ct. 156, 30 L.Ed.2d 88 (1971). *See generally United States v. Beechum*, 582 F.2d 898, 911 n. 15 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

■ Appellants' protestations of guilt by association are likewise to no avail. While an inference of conspiracy can never rest solely on ties of friendship or kin, such associations comprise one factor of many which may be considered in ascertaining the existence of a conspiracy. *United States v. Cole*, 704 F.2d 554, 557 (11th Cir.1983).

Harrell further argues that an unsolicited reference by witness Barnes to Harrell's arrest record compels reversal of his convictions. On direct examination, the prosecutor asked Barnes, an Outlaws drug runner, where he obtained his wares:

Q. Now, when you went to the lake house, who would you get the drugs from?

A. Well, at first, I was just getting them off of J.J. Roadblock was in jail and one to three days after he had gotten out of jail, I went out and—

The trial court denied Harrell's motion for a mistrial. In lieu thereof it offered a cautionary instruction, which counsel twice declined.

■ Barnes' remark was testimony of Harrell's character, which should have been excluded because Harrell had not previously placed his character in dispute. *See United States v. Warf*, 529 F.2d 1170 (5th Cir.1976). We cannot say that the testimony was beyond the curative powers of an instruction, however,[8] so as to exert a substantial impact on the jury's verdict. Given the overwhelming proof of Harrell's guilt, we conclude that the error was harmless. *See United States v. Chilcote*, 724 F.2d 1498, 1502 (11th Cir.1984); *United States v. Klein*, 546 F.2d 1259, 1263 (5th Cir.1977).

■ Harrell's final evidentiary objection concerns the necessary predicate to identify illicit drugs. According to Harrell, a witness who testifies about controlled substances must swear to having used the drug on the occasion in question as well as to familiarity based on prior use or sale. The law of this circuit, however, takes a more expansive view. Identification of a controlled substance does not require direct evidence if available circumstantial evidence establishes its identity beyond a reasonable doubt. Such evidence can include lay experience based on familiarity through prior use, trading, or law enforcement; a high sales price; on-the-scene remarks by a conspirator identifying the substance as a drug; and behavior characteristic of sales and use such as testing, weighing, cutting and peculiar ingestion. *United States v. Sanchez*, 722 F.2d 1501, 1506 (11th Cir. 1984); *United States v. Crisp*, 563 F.2d 1242, 1244 (5th Cir.1977); *United States v. Quesada*, 512 F.2d 1043, 1045 (5th Cir.), *cert. denied*, 423 U.S. 946, 96 S.Ct. 356, 46 L.Ed.2d 277 (1975). Identification based on

---

weighed by the relevance such evidence had to the conspirators' motives.

**8.** *Compare United States v. Klein,* 546 F.2d 1259, 1263 (5th Cir.1977).

past use coupled with present observation of the substance at hand will suffice to establish the illicit nature of a suspected substance. The testimony to which Harrell objects falls within these bounds.[9]

## IV. SUFFICIENCY OF THE EVIDENCE

 Appellants Scire and Hawkins urge reversal on grounds of insufficiency of the evidence. On review, we must affirm if the evidence and the inferences it supports, viewed in the light most favorable to the government, would permit a reasonable trier of fact to establish guilt beyond a reasonable doubt. Such evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Applying this standard, we affirm as to Scire and reverse in part as to Hawkins.

### A. *Tony Scire*

Scire was convicted under Counts One and Six, respectively, of conspiracy to possess with intent to distribute controlled substances and possession with intent to distribute cocaine. At trial he was the sole defendant to take the stand. Scire portrayed himself as a mild-mannered south Florida businessman who lived alone next door to his mother with no companionship except for his attack dog Gina. Although not an Outlaw himself, he and Hawkins were good friends. The two, inveterate gamblers, frequently met and placed bets at racetracks in Florida, Kentucky and elsewhere. Scire admitted his gambling associ-

ation with Hawkins, but adamantly denied any involvement in Outlaws drug trafficking.

Other Outlaws came to know or know of Scire through Hawkins. Their testimony painted a different picture of Scire's dealings. Jerry Luke Owens, for instance, worked for Hawkins as a drug courier to Detroit in 1980. Owens testified that, according to Hawkins, a "Tony" in Miami or south Florida supplied the bulk cocaine that Owens sold.

Government witness Paul Clendening met Scire through Hawkins. Beginning in September 1981, after Clendening moved into Hawkins' house in Tampa, Hawkins began taking the Outlaws recruit to Miami for the stated purpose of visiting Scire and obtaining cocaine. The pair made a total of four trips. Clendening testified that Hawkins carried cocaine only on the return leg. On the first trip, Clendening testified, Hawkins arrived at Scire's house and asked where he could get some cocaine. Scire replied that he didn't know, but that he would check into it. He and Hawkins then disappeared into Scire's bedroom. Hawkins emerged with a quarter ounce of cocaine. After an overnight stay at Scire's home, Hawkins and Clendening returned to Tampa, where they weighed the cocaine, cut it with procaine, and bottled it for sale.

On each of the following three visits, according to Clendening, Hawkins asked Scire whether he could procure some cocaine, with varying results. On the second return trip, Hawkins produced cocaine from a folded paper towel and snorted it with Clendening in a gas station men's room. The following time Scire promised to "check into" getting some cocaine, but

---

**9.** Jerry Luke Owens testified that he became a user and pusher of an assortment of drugs, including cocaine, amphetamines, and quaaludes, long before he joined the Tampa chapter. Such experience qualified him to tell of trips he made to Oklahoma City and Detroit to sell cocaine and quaaludes. William Barnes, who testified that he bought speed from Harrell at $500 an ounce, was thereby qualified to relate the story of his courier runs to New Orleans for resale. Paul Clendening admitted that he al-

ready was a frequent cocaine user by the time he met the Tampa Outlaws. This testimony of habitual use coupled with observations of Harrell's characteristic behavior qualified Clendening to identify the substance that he observed Harrell snorting at a Fort Myers, Florida party as cocaine. Harrell's onetime "old lady," Melanie Platt, testified that she recognized from prior personal use the substances Harrell had her ply at bars as speed, quaaludes and "tea".

none materialized. The fourth visit was entirely unproductive: Scire told Hawkins that the supply was "dry, there wasn't any."

On appeal Scire argues that the evidence establishes at best that Scire provided Hawkins with cocaine for personal use rather than for large-scale distribution. According to Scire, the quarter ounce of cocaine Hawkins obtained on the first trip was too small a quantity to demonstrate an agreement to join a massive drug distribution ring. Alternatively, he argues that Hawkins' agreement to buy what Scire had to sell, standing alone, does not establish the joint objective necessary to prove a conspiracy.

 These arguments miss the mark. The evidence shows involvement far beyond one or two isolated sales. The government offered testimony from which a reasonable jury could infer that Scire supplied Hawkins with cocaine for distribution to Detroit and elsewhere as early as 1980. During Clendening's 1981 visits to Scire's house, Scire's consistent agreeability to "checking into" cocaine confirms that he extended his hospitality to the Outlaw callers to the extent of transacting drug sales. Although Hawkins returned from Miami with what seemed to be a small supply of cocaine, the first trip nevertheless yielded enough to cut and prepare for resale. From these facts, taken together, the jury could have reasonably concluded that Scire had an ongoing agreement to supply Hawkins with cocaine for redistribution.[10] *Compare United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978), *with United States v. Caro*, 569 F.2d 411, 418–19 (5th Cir.1978). The evidence likewise supports Scire's conviction on the substantive count.

### B. *James Hawkins*

Hawkins' sufficiency challenges are directed at his convictions on Counts Two and Three. Finding no merit in his claim regarding Count Two, we affirm. We reverse as to Count Three.

Count Three charged that "[i]n or about February, 1980," Harrell, Hall and Hawkins "did travel and cause travel in interstate commerce from the Middle District of Florida to Oklahoma City, Oklahoma" in violation of the Travel Act. The evidence relating to this charge consists of three courier runs Jerry Luke Owens made on Harrell's behalf to deliver drugs to Oklahoma City. The Oklahoma City route ended with Owens' arrest on February 18, 1980.

Hawkins argues that the evidence linking him to Harrell, Hall or the Tampa Outlaws on or before the date of Owens' arrest is too scant to support his conviction on Count Three. Owens testified that he joined the Tampa Outlaws "about '78" and left the chapter "in the summer of '80." He recalled meeting Hawkins after joining the Tampa chapter, but he could not remember when. Owens was asked who witnessed his conversations with Harrell about the Oklahoma City trips, and the following exchange ensued:

Q. Do you remember if anybody else was there when Roadblock talked to you about going to Oklahoma City?

A. Well, his partners was usually around.

Q. And based on your observation, who are you referring to by his partners?

A. J.J. and Hawk [Hawkins].

The first firm evidence implicating Hawkins in Tampa Outlaws drug dealing dates from the summer of 1980, when Hawkins drove Owens to Detroit in his Lincoln for a two-week trip to peddle cocaine and quaaludes. In recounting the story of this trip, Owens admitted that he was having difficulty remembering dates. He could remember when the Detroit trip occurred only by recalling that "the cherries were ripe in Detroit at the time." Detective Grady Snyder of the Tampa Police Depart-

---

**10.** Scire argues that a reasonable jury would have to entertain a reasonable doubt whether Scire was the one who supplied Hawkins with cocaine. Owens' testimony coupled with the bedroom scene adequately refutes this argument under the guidance of *Bell*.

ment, who had monitored Outlaw activities since 1976, stated that he first heard that Hawkins was in the Tampa area in September 1980. Although Hawkins told Paul Clendening in 1981 that he, J.J. Hall and Harrell were partners in cocaine dealing, the record establishes that Hawkins was the last of the three to join the enterprise.

■ We agree that this evidence is too slender a reed to support Hawkins' conviction of the Oklahoma City Travel Act violation. The fact that Harrell's partners were "usually around" and that Owens regarded Hall and Hawkins as Harrell's partners cannot prove that Hawkins was present at any of the courier meetings in question. At best, the evidence establishes that Owens did not know when Hawkins arrived in Tampa, but that after he did arrive, he was usually present during Harrell's discussions with couriers. Owens' testimony necessarily leaves reasonable doubts whether Hawkins actually listened in on the Oklahoma City conversations.

■ Nor is Hawkins liable as a principal for substantive offenses committed and completed before he joined the drug trafficking conspiracy. "[A] latecomer cannot be convicted as a principal for substantive offenses which were committed in furtherance of the conspiracy before he joined it or after he withdrew from it." *Gradsky v. United States*, 376 F.2d 993, 996 (5th Cir.), *vacated in part on other grounds*, 389 U.S. 18, 88 S.Ct. 1, 19 L.Ed.2d 18, *cert. denied*, 389 U.S. 908, 88 S.Ct. 224, 19 L.Ed.2d 224 (1967); *see Levine v. United States*, 383 U.S. 265, 86 S.Ct. 925, 15 L.Ed.2d 737 (1966); *United States v. Knippenberg*, 502 F.2d 1056, 1059–60 (7th Cir. 1974); *United States v. Apollo*, 476 F.2d 156, 162 (5th Cir.1973). We therefore reverse as to Count Three.

■ The proof of the Detroit trip requires affirmance of Hawkins' conviction on Count Two. That count charged Hawkins, Harrell and Hall with knowingly possessing with intent to distribute cocaine "[i]n or about February 1980 ... at Tampa in the Middle District of Florida." The evidence adduced at trial established possession during summer 1980 at the earliest, rather than in February 1980 as alleged in the indictment. A variance between dates alleged and dates proved will not trigger reversal, however, as long as the date proved falls within the statute of limitations and before the return date of the indictment. *United States v. Phillips*, 664 F.2d 971, 1036 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Because we detect no likelihood that the variance subjected Hawkins to undue surprise or exposed him to the possibility of a second prosecution for the same offense, *see id.*, we affirm.

## V. REDUCTION OF SENTENCE

The final contention pressed on appeal contests the length of sentences imposed under Count One. Harrell and Hawkins were both sentenced to fifteen years under that count for conspiring to violate the substantive prohibitions of 21 U.S.C. § 841(a)(1). Section 846, the companion sentencing provision, limits the punishment for that offense to the maximum punishment prescribed for the offense whose commission constituted the object of the conspiracy. The maximum sentence for a first conviction of possession with intent to distribute cocaine is imprisonment for fifteen years and a fine of $25,000. *Id.* § 841(b)(1)(A). The remaining controlled substances violations carry a maximum prison sentence of five years and a fine of $15,000. *Id.* § 841(b)(1)(B).

Appellants argue that the inherent ambiguity of the general verdict made it impossible to determine whether the conspiracy as found had single or multiple objects, and what those objects were. Because the government did not request a special verdict to clarify which drugs comprised the objects of the conspiracy as found, and because the trial court framed its instruction in the disjunctive, allowing the jury to

convict if it found a conspiracy to distribute either methaqualone, amphetamine, methamphetamine, or cocaine, appellants maintain that it is impossible to ascertain with certainty whether cocaine was or was not an object. Arguing that their punishment thus must be restricted to the five-year maximum sentence allowable when cocaine is not involved, they conclude that their sentences are illegal.

■ Appellants overlook one critical point: their failure to raise this issue at trial, through either an objection to the form of the indictment, a request for a special verdict, *Cf. United States v. Gomez-Geraldo*, 652 F.2d 452 (5th Cir. Unit B 1981), or an objection to jury instructions. Since the imposition of such a sentence does not amount to clear and prejudicial error, reversal in the absence of an objection is not warranted. *See United States v. Vincent*, 648 F.2d 1046, 1050 (5th Cir. Unit A 1981) (lesser included offense instructions); *Williams v. United States*, 238 F.2d 215 (5th Cir.1956) (same), *cert. denied*, 352 U.S. 1024, 77 S.Ct. 589, 1 L.Ed.2d 596 (1957); 8 J. Moore, *Moore's Federal Practice*, § 8.03[2], at 8–10 (2d ed. 1983).

## VI. CONCLUSION

To summarize, we reverse Hawkins' conviction on Count Three. We affirm the trial court in all other respects.

AFFIRMED IN PART AND REVERSED IN PART.