**UNITED STATES of America, Appellee,**

v.

**Russell DAMSKY, Peter B. Findlen, Gary Romano, Defendants-Appellants.**

**Nos. 1241, 1242 and 1243, Dockets 83–1441, 83–1442 and 83–1443.**

United States Court of Appeals, Second Circuit.

Argued May 21, 1984.

Decided July 18, 1984.

Certiorari Denied Oct. 15, 1984. See 105 S.Ct. 298.

Richard I. Rosenkranz, Brooklyn, N.Y. (William Lupo, Brooklyn, N.Y., of counsel), for defendant-appellant Damsky.

Norman Corenthal, New York City (Siegel, Donlevy & Corenthal, New York City, of counsel), for defendant-appellant Findlen.

Lawrence S. Goldman, New York City (Jay K. Goldberg, Goldman & Hafetz, New

York City, of counsel), for defendant-appellant Romano.

Gloria C. Phares, Dept. of Justice, Washington, D.C. (Frederick J. Scullin, Jr., U.S. Atty., for the Northern District of New York, Syracuse, N.Y., of counsel), for appellee.

Before FRIENDLY, MESKILL and KEARSE, Circuit Judges.

MESKILL, Circuit Judge:

Russell Damsky, Peter Findlen and Gary Romano appeal their convictions after a jury trial in the United States District Court for the Northern District of New York, Miner, *J.*, of one count of possession of hashish with intent to distribute, under 21 U.S.C. § 841(a)(1) (1982), and of one count of conspiracy to commit the substantive offense, under 21 U.S.C. § 846 (1982). Damsky and Findlen additionally appeal the imposition of cumulative sentences on their convictions. We affirm.

## I

### THE FACTS

The jury heard the following evidence. DEA Agent Ronald Rockwell and confidential informant Peter Van Der Voort posed as major drug distributors in an investigation that began in Frankfurt, West Germany in May 1983. Van Der Voort introduced Rockwell to Daphne Van Der Does who was interested in purchasing hashish in the United States. Rockwell and Van Der Voort informed Van Der Does that there were 3,000 kilos of hashish available through a "Mr. Joseph." After Van Der Does expressed interest in a purchase, Rockwell introduced her to DEA Agent Marino Milano, a/k/a "Mr. Joseph," and Agent John Brown, who posed as Mr. Joseph's bodyguard.

Van Der Does telephoned her partner, Gerardus Hulst, in London, and then confirmed the transaction. Hulst and Van Der Does traveled to Syracuse, New York on June 3, 1983 to discuss the matter further with Agent Milano. Hulst wanted to see the hashish before agreeing to the purchase, so Milano took him and Van Der Does to a DEA "stash house" where 3,000 kilograms of hashish previously confiscated by the government were being stored. Hulst, Van Der Does and Agents Brown and Milano discussed a sale at the stash house; Hulst said he intended to transport the hashish by truck and said he would have three of his "strong boys" come to pick it up.

Agents Brown and Rockwell met Hulst and Van Der Does again in Syracuse on June 12. Hulst's "people" had arranged for a camper to be at the Howard Johnson's motel in Watertown. Hulst was to get the camper keys and give them to Brown, who would take the camper to the stash house, load it and return to the Howard Johnson's.

Early on June 13, Hulst and Agent Brown went to a room at the Howard Johnson's. Appellant Russell Damsky was at the motel at that time, but the camper had not yet arrived. In casual conversation, Brown lamented that the hashish would smell bad because it was so hot. Damsky said he knew that the smell would be a problem because he had "done this before," but it was "their problem" because he would be riding behind the camper in another car. Shortly after, Brown argued with Hulst and Damsky about payment arrangements for the hashish. Hulst told Brown he would try to call "Peter" to resolve the dispute. They went to a nearby Ramada Inn to make the call, but "Peter" did not answer. Hulst and Brown then agreed on a down payment and returned to the Howard Johnson's. Damsky told Brown that one of the drivers was outside and wanted to talk to him about how to load the hashish.

Agent Brown approached appellant Peter Findlen, who was standing near the camper. Findlen immediately told Brown he wanted to show him where to put the "stuff," cautioned Brown to lower the shades on the sides of the camper, suggested Brown use a radar detector, warned Brown not to speed and showed Brown

how the boxes of hashish could be arranged to fit inside the camper. Findlen gave Brown the keys to the camper; Brown drove to the stash house, loaded it and returned to the Howard Johnson's. Damsky, however, refused to give Brown the balance of the money until the load had been checked and rearranged. Brown said he would not turn over the camper's key until he had all the money, but Damsky informed him there was a spare key underneath the hood. Brown, looking out the window from Damsky's room, saw Findlen and appellant Gary Romano lifting the hood and looking under it. Findlen and Romano then went into the camper; as Brown described it, "at one point [they opened] a box up and rummage[d] through the things." Tr. at 380, App. at 50.

In the meantime, Brown and Damsky continued to argue about the money. Damsky finally gave in, saying he presumed everything was all right with the delivery, or Findlen and Romano would have told him otherwise. Brown left the key to the camper on top of Damsky's television set and departed with Hulst.

Hulst, Van Der Does, Damsky, Romano and Findlen were subsequently arrested. Hulst and Van Der Does pleaded guilty to one count of possession of hashish with intent to distribute and one count of conspiracy to commit the substantive offense. Hulst received consecutive sentences of ten years incarceration on the conspiracy count and five years on the substantive count,

with a two year special parole term on Count II. Van Der Does received sentences for the same terms as did Hulst, but her sentences ran concurrently.

Damsky, Findlen and Romano were tried jointly and each was convicted on both counts. Damsky and Findlen received consecutive sentences of three years each on Counts I and II, with a two year special parole term on Count II. Romano received concurrent sentences of four years on both counts, with a two year special parole term on Count II. Each now appeals.

## II

### THE JURY READBACK ISSUE

Romano's defense was based on the contention that he did not know what was in the boxes he carried. In their summations, the prosecutor and Romano's attorney disagreed sharply on whether Agent Brown's testimony suggested that Romano had opened up the boxes.[1] The prosecutor told the jury that he would "guarantee" the correctness of his version of the testimony. Both the prosecutor and Romano's attorney asked the jury to request a readback of this testimony so the jury could determine exactly what Agent Brown said. The jury made no request for a readback.

Romano now contends that the trial court erred when it told the jurors to search their memories before asking for trial testimony to be read back from the stenographer's tape.[2] Romano further con-

---

1. The testimony was as follows:

   PROSECUTOR: Could you tell us what you saw and heard outside?

   AGENT BROWN: Like I say, I saw Mr. Findlen and Mr. Romano walk from the building to the camper. I saw them open the hood of the motor compartment of the camper. I saw them walk to the side out of my view, and then through the window that was open, I could see them moving boxes around inside. At one point I saw them open a box up and rummage through the things.

   PROSECUTOR: Could you tell which was doing which?

   AGENT BROWN. I could see the yellow sleeves, bright yellow sleeves that Romano had on his shirt moving, carrying boxes. Mr. Findlen was bare-armed. He was wearing a short-

   sleeved shirt. In fact, that day he had a big scar or a big wound on his arm.
   Tr. at 380–81, App. at 50–51. Agent Brown's testimony about Romano's yellow sleeves appears to have been a response not to the prosecutor's actual question, but to a question such as "Could you tell which was which?" or "How could you tell which was doing which?" While Agent Brown's testimony that he "saw them [Romano and Findlen] open a box" certainly raises an inference that Romano opened a box, the jury could rationally have found that this testimony alone did not sufficiently prove it.

2. Findlen, whose attorney also asked the jury to request readbacks, similarly contends that the trial court's discouragement of readbacks was error. We decline to find an abuse of discretion as to Findlen, absent other factors such as the

tends that the jury verdict should be reversed because this discouragement of testimonial readbacks came after both prosecution and defense had asked for a readback of specific disputed testimony, and after the prosecutor improperly and incorrectly "guaranteed" his version of the disputed testimony. While we conclude that the trial court erred by discouraging the jury from asking for readbacks, we hold that the error was harmless.

■ Whether to allow testimony to be read back to the jury is within the trial court's sound discretion. *See, e.g., United States v. Price,* 447 F.2d 23, 31 (2d Cir.), *cert. denied,* 404 U.S. 912, 92 S.Ct. 232, 30 L.Ed.2d 186 (1971); *United States v. Ratcliffe,* 550 F.2d 431, 434 (9th Cir.1976) (per curiam) (trial court refused to allow any readbacks in order to induce jurors to pay attention; held, no abuse of discretion). In making the determination, the trial court, in its discretion, may take into account factors such as whether reading certain testimony back will unduly call attention to it, *see United States v. Nolan,* 700 F.2d 479, 486 (9th Cir.), *cert. denied,* — U.S. ——, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983); whether giving the readback will unduly delay the proceeding, *id.;* and the difficulty involved in giving a readback, *see United States v. Almonte,* 594 F.2d 261, 265 (1st Cir.1979). Like any other discretionary decision of a trial court, however, decisions regarding testimonial readbacks are not unreviewable.

Here, the district court did not refuse to allow any testimony to be read back. Instead, it told the jury in its charge:

Although our able court reporter, Mr. McGloine, has a record of these proceedings made on his shorthand stenotype machine, there is no transcript of the proceedings at this time, so before asking for any testimony to be read back, I urge you to exhaust your collective memories before asking for a readback. The trial has not been a long one, and the evidence should be fresh in your memories. The services of Mr. McGloine are available to you, but it may take some time to locate particular information.

Tr. at 571, App. at 172.

■ While urging a jury to try to remember testimony before asking for a readback is not generally error, *see United States v. Pimental,* 645 F.2d 85, 87 (1st Cir.1981), it does not seem to be particularly wise policy. Still, we would not find an abuse of discretion had the prosecutor not told the jury in his rebuttal, "As far as Mr. Romano and John Brown's testimony with respect to a box being opened, have the testimony read back, because *I will guarantee you that he said it, that Romano had a yellow shirt on and he could see the yellow sleeves opening a box."* Tr. at 541, App. at 142 (emphasis added). The prosecutor's version of the testimony was incorrect; Agent Brown never said that someone with yellow sleeves opened a box. More importantly, a juror who had been discouraged from requesting a readback by the trial judge might well have relied on the prosecutor's improper "guarantee"[3] rather than the juror's own recollection of the testimony. We conclude that given the disagreement over the contents of the testimony, the suggestion by both prosecution and defense that the jury ask for a readback, and the prosecutor's erroneous and improper "guarantee" of the contents of

---

improper prosecutorial "guarantee" of the testimony involving Romano.

**3.** The prosecutor's "guarantee" of the contents of the testimony was clearly improper. A prosecutor must scrupulously refrain from injecting his credibility into any part of the trial. *See, e.g., United States v. Clark,* 613 F.2d 391, 405 (2d Cir.1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). Nonetheless, this excessively zealous "guarantee" (to which defense counsel did not object) did not deprive Romano

of a fair trial and was not severe enough to warrant an admonition of the prosecutor. *Cf. United States v. Modica,* 663 F.2d 1173, 1182–86 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).

The misstatement of evidence itself is not grounds for reversal; counsel did not object and there is no plain error. We thus only consider here the propriety of the trial court's discouraging jury readbacks, given the circumstances of this case.

the testimony, the trial court abused its discretion by discouraging the jurors from requesting that the testimony in question be read back to them.

Nevertheless, we hold that the error was harmless, for we are convinced that "the error did not influence the jury, or had but very slight effect." *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946) (nonconstitutional error). *See United States v. Quinto*, 582 F.2d 224, 235 (2d Cir.1978). The government's case against Romano did not turn on whether Romano saw what was in the boxes, but on whether there was evidence that Romano was part of a scheme knowingly to sell hashish. The evidence of this, although circumstantial, was extremely strong. Hulst said three of his "strong boys" would pick up the hashish. Tr. at 229. The three were easily inferred to be Damsky, who was with Hulst in the motel room at Howard Johnson's, and Romano and Findlen, who were in the Howard Johnson's parking lot checking and rearranging the load of hashish Hulst had bought from the government agents. Romano's participation in a drug transaction with other conspirators,[4] while not itself proof of Romano's knowledge of the conspiracy, is at least evidence from which the jury can infer knowledge. *See United States v. Cole*, 704 F.2d 554, 557 (11th Cir.1983). Also, Romano and Findlen knew the location of the spare key to which Damsky referred when Damsky was arguing with Brown about money, and used that key to enter the camper. Furthermore, the mere smell of the hashish, which Damsky admitted would be especially bad because of the heat, Tr. at 352, supports an inference that Romano was aware of what was in the boxes when he was carrying them. *See, e.g., United States v. Ard*, 731 F.2d 718, 725 (11th Cir.1984); *United States v. Flynn*, 664 F.2d 1296, 1307 (5th Cir.), *cert. denied*, 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982); *United States v. Diamond*, 471 F.2d 771, 773 (9th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2751, 37

L.Ed.2d 161 (1973). And when Brown returned to the Howard Johnson's with the camper, Damsky told him, "You are not going to get the rest of the money until they go out and check out the load. They want to make sure it is all there. They want to rearrange it for the trip." Tr. at 375. Findlen and Romano then entered the camper and began to move or open the boxes. Tr. at 376, 380. Later, when Hulst screamed at Damsky to give Brown the money, Damsky said, "I guess everything is all right.... [I]f it wasn't all there, they would have told me ...." Tr. at 381, App. at 51. Given such strong evidence of Romano's knowledge of the nature of the transaction, we are satisfied that a readback of Agent Brown's testimony would not have affected the jury's verdict. Thus, the trial court did not commit reversible error.

### III

### APPELLANTS' OTHER CONTENTIONS

■ Appellants argue that because the government never intended to relinquish the hashish, appellants never had "dominion and control" over it. Therefore, they argue, they did not "possess" the hashish in violation of 21 U.S.C. § 841. *See United States v. Baratta*, 397 F.2d 215, 224 (2d Cir.), *cert. denied*, 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276 (1968). We rejected a virtually identical argument with respect to illegal possession of firearms in *United States v. Toner*, 728 F.2d 115, 128 (2d Cir.1984), and reject it again here with respect to possession of hashish. *Accord United States v. Martorano*, 709 F.2d 863, 869 (3d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. Jones*, 676 F.2d 327, 332 (8th Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 71, 74 L.Ed.2d 71 (1982). Damsky had dominion and control over the camper once he was given the key and was therefore in constructive possession of the hashish in the camper. *See United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983).

---

**4.** Some of the evidence linking Findlen and Damsky to the drug conspiracy is discussed *in-* *fra,* Part III.

■ Each appellant claims he was not involved enough in the transaction to be guilty of possession. Romano's claim that he only moved boxes is rejected for the reasons discussed in Part II above. As for Findlen's claim that he was merely a "truck driver," Br. at 15, a rational jury could easily have found otherwise. For example, Damsky told Agent Brown that his driver was waiting outside of the motel room to talk to Brown. Brown went outside and was greeted without introduction by Findlen, who said, "Look, I want to show you where to put the stuff." Tr. at 365. Findlen then showed Brown how to load the heavy boxes in the camper, told Brown to lower the shades, to avoid speeding and to use the radar detector, and then gave Brown the keys to the camper for the trip to the stash house. After Brown's return, Findlen, like Romano, knew of the spare key and was among the people Damsky was relying on to ensure that all had gone well.

Damsky claims that he was a mere casual "facilitator," see Br. at 18, but the evidence overwhelmingly showed that he was an integral part of the transaction. For example, he argued with Brown often about the cost of the hashish and the delivery of the money. He was in the motel room with Hulst on the day of the transaction and responded to Hulst's plea that Damsky should give the money to Brown so that Hulst could leave. There is ample evidence that all three appellants were active and knowing participants in the drug transaction.

■ Next, appellants claim that their convictions should be reversed because the trial court issued an aiding and abetting charge under 18 U.S.C. § 2 (1982), although there were no allegations of aiding and abetting in the indictment. We disagree. A trial court may give an aiding and abetting charge where, as here, the prosecution makes known that it intends to pursue an aiding and abetting theory and when the evidence warrants such a charge. *United States v. Smith*, 727 F.2d 214, 217 (2d Cir.1984). This rule ensures that there is no unfair surprise to the defendant and that the government continues to carry its burden of proof. *Id.* at 218. In *Smith*, 727 F.2d at 218 n. 5, we held that there was no unfair surprise when the government gave notice that it would seek an aiding and abetting charge on the day the defense began its case. Here, the government filed its request for an aiding and abetting charge (contained in Proposed Jury Instruction No. 40) on November 14, 1983, two days before the jury was chosen and sworn (*see* App. at 5–6). Moreover, the very nature of the government's case was that each appellant assisted Hulst and Van Der Does in some important way in the sale of the hashish. Appellants cannot successfully claim that the aiding and abetting charge surprised them or prejudiced their defense. As demonstrated above, there was ample evidence that all three appellants aided and abetted in the criminal hashish transaction.

■ Findlen claims that a photographic identification procedure, in which an FBI agent placed four photographs (two of which were of Findlen) in front of a witness and asked if the witness recognized any of the individuals in the pictures, was improper. He argues that because of the impropriety of this proceeding, the witness' subsequent in-court identification of Findlen should have been suppressed. The district court found that although the procedure was unnecessarily suggestive, the witness, Douglas Jones, had an ability to recognize Findlen independent of the photographs. *See, e.g., Neil v. Biggers*, 409 U.S. 188, 198–200, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972). We hold that the district court's finding was not clearly erroneous. Jones testified that he had seen Findlen "ten or fifteen times" over a year-and-a-half span, from close range, in adequate light and for a few minutes at a time. Each time Jones met with Findlen, he was wearing his glasses and observing Findlen during daylight hours. Tr. at 11, App. at 16. Jones' testimony makes clear that he knew Findlen's appearance well before and apart from the display of the photographs.

■ Damsky contends that the prosecutor improperly commented on his failure to

testify, in violation of *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), when he told the jury in summation: "[T]here has never ... been a challenge to the credibility of any one of those agents .... The testimony of those agents has been accepted and not challenged in this courtroom." Tr. at 497, App. at 98. This argument is misplaced. Taken in context, this statement could not be reasonably construed as a comment on Damsky's failure to testify. It was simply an attempt to show that the agents' testimony was uncontradicted. This does not violate the *Griffin* "no-comment" rule. *United States v. Rodriguez,* 556 F.2d 638, 641–42 (2d Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1233, 55 L.Ed.2d 762 (1978). We also reject Damsky's contention that the prosecutor improperly vouched for the veracity of his witnesses.

Appellants' other claims of error, including the challenge to the sentencing, do not warrant elucidation beyond the statement that we find them to be without merit.

Affirmed.