878 F.2d 1329
 28 Fed. R. Evid. Serv. 435
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert LEAVITT, Rolondo Sosa, a/k/a Ernesto Matos, Carlos
Garces, Carlos D. Coronel, a/k/a John Doe, a/k/a "El Chino",
David Catena, a/k/a David Caterer, Hilario Perez-Diaz, a/k/a
Joe Doe, a/k/a "Yayo", Manuel De Armas, Hector Ortega,
Defendants-Appellants.
 No. 85-5773.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 3, 1989.
 
 Dexter W. Lehtinen, U.S. Atty., Lynn Lamprecht, Linda Collins Hertz, David O. Leiwant, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellees.
 Clifford B. Hark, Miami, Fla., for Leavitt.
 Frank J. Petrella, Atlanta, Ga., for Catena.
 Theodore J. Sakowitz, John Weinberg, Federal Public Defenders, Randee J. Golder, Asst. Federal Public Defender, Miami, Fla., for Perez-Diaz, De Armas, Garces, Sosa.
 Sophie DeMayo, Miami, Fla., for Coronel.
 Appeal from the United States District Court for the Southern District of Florida.
 Before CLARK and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.
 CLARK, Circuit Judge:
 
 
 1
 This appeal arises from the conviction of eight defendants on various drug charges for their involvement in a scheme that imported millions of quaalude pills and large quantities of marijuana into the United States between December 1980 and August 1981. The appellants raise numerous issues on appeal. Finding no error, we affirm the convictions of all the defendants on all the charges.
 
 I.
 A. FACTS
 1. The Cast of Characters
 
 2
 The testimony at trial proved that between December 1980 and October 1981, a core group of individuals imported a shipment of quaaludes into the United States on the average of once a month. On some occasions, the shipments also included marijuana. Martin Gil, an unindicted coconspirator,[1] masterminded the scheme with his middleman Carlos Garces. Frank Smidt and John Crump provided the drugs through connections in Colombia and Robert Leavitt was the distributor of the drugs in the United States. The shipments were generally imported in the same manner. One of several pilots including Wilbur Jackson, Russell Crump, and David Catena, would fly a plane into the Bahamas at night where the shipments were unloaded. Hector Ortega and Jose Rodriguez were responsible for unloading the shipments and transferring them to speedboats which brought the cargo into the United States. Carlos Coronel, a/k/a/ "El Chino", often supplied the speedboats and stored the drugs in Miami. Manuel De Armas, Rolondo Sosa, and Hilario Perez, a/k/a/ "Yayo" assisted at various stages.
 
 
 3
 Four of the individuals intimately involved in the importation scheme agreed to testify for the government: Jose Rodriguez, John Crump, Russell Crump and Wilbur Jackson. Rodriguez worked for Smidt, Garces and Gil at various times and therefore was present at many of the meetings regarding the shipments and was actually involved in every attempted shipment for Gil. John Crump testified about the few transactions in which Rodriguez was not involved. Russell Crump and Wilbur Jackson were both pilots who flew on several of the missions. They testified to the following sequence of events.
 
 2. Garces' Loads--Counts III, IV & XV
 
 4
 John Crump testified that in December 1980, Frank Smidt told him that Carlos Garces wanted to buy quaaludes and marijuana from them and would supply a plane to fly to Colombia. At the time Rodriguez worked for Smidt and was present when Garces and Schmidt discussed a plan to import the quaaludes and marijuana. Crump arranged for the quaaludes and marijuana to be picked up at a landing strip in Colombia. The load was then flown to Bimini where it was loaded into speedboats and brought to Miami. When the pills arrived in Miami, Smidt asked Rodriguez to bring samples of the pills and marijuana back to Smidt and Garces. Garces took three of the pills and lost consciousness. Later Garces told Rodriguez that the pills were of good quality.
 
 
 5
 Because much of the load was wet, however, Garces was unable to pay Smidt all the money he owed. Thus in January 1981, John Crump, Smidt, and Rodriguez agreed to import another load with Garces to help him pay off the first load. Crump met with Garces several times to plan the deal and communicated with Crump's partner, Jaime Guillot-Lara, in Colombia, by ham radio. In April 1981, they sent a plane down to Colombia to pick up a supply of over 300,000 quaaludes. This load was also flown to the Bahamas and then taken by speedboat to Miami. Garces eventually paid Crump $60,000 in installments for this shipment.
 
 3. Gil's First Load--Count V
 
 6
 During this same time, Gil was organizing a comprehensive importation scheme. In December 1980 Gil hired Wilbur Jackson to fly to and from South America to pick up quaaludes. Jackson testified that he had a series of meetings with Gil, his wife Thelma, and Hector Ortega to iron out the details. Gil agreed to pay Jackson $25,000 to fly from Bimini to Colombia where he would land, load the drugs, and refuel. He would then fly back to Bimini at night and the quaaludes would be transferred to boats to bring them to the United States. Ortega's job was to light the runway at the airstrip in Bimini and to oversee the unloading and transfer of the cargo to the speedboats.
 
 
 7
 Jackson made his first trip to Colombia in December 1980 accompanied by another pilot named Bassem "Sam" Bourhan. Upon landing in Colombia, Jackson weighed the boxes and opened several of them to ensure that they were getting quaaludes. They loaded approximately fifteen to sixteen hundred pounds of quaaludes pills--one million quaalude tablets--onto the plane and took off for Bimini. As was his responsibility, Ortega lit up the runway and supervised the unloading and transfer of the pills to the speedboats.
 
 
 8
 4. January and February 1981--Counts VI, VII & VIII
 
 
 9
 In January 1981, Gil asked Jackson to go to Bimini to help load a second shipment of quaaludes onto boats and ensure that they were transported safely to Miami. The shipment was to be flown in by Sam and another pilot named Roberto. Jackson met with Ortega and Manuel De Armas to discuss the loading of the boats. De Armas and Jackson went to Bimini at night and waited at the dock area of an abandoned hotel but they never received any quaaludes. The next morning they were informed that the pilots had been arrested by the Bahamian police the night before in the possession of thirty boxes of quaaludes.
 
 
 10
 Because of the failed attempt, Gil, Ortega, Jackson and Sam planned another shipment.[2] Jackson and Sam went to Bimini and flew to Colombia but were unable to establish radio contact there. Because they were low on fuel, they flew to Aruba and called Gil who told them that there was a slight delay. About two days later, Jackson and Sam flew back to Colombia and picked up approximately fifteen to sixteen hundred pounds of quaaludes. In Bimini, they were met by Ortega and Gil. Ortega and some Bahamians unloaded the quaaludes and transferred them to the speedboats.
 
 
 11
 After the success of these two shipments, Gil bought his own airplane to use in the drug operations--a Queen Air N911Q. In the new plane, Jackson and Sam brought a shipment of quaaludes into Bimini for Pedro Andres. Ortega loaded them into speedboats and the shipment was brought to the United States.
 
 5. The March incidents--Counts IX, X & XI
 
 12
 During this same time, Rodriguez participated in discussions with Gil, Ortega, Garces and Rolondo Sosa about using a larger plane, a DC-3, in the importation scheme. In March 1981, Jackson flew a shipment to Bimini in the DC-3. While Rodriguez, Gil, Ortega and Sosa were waiting for the plane to land, another plane touched down and dropped sixteen packages of marijuana and took off again but these packages were confiscated by the Bahamian police. When the DC-3 landed, they all unloaded the shipment which included quaaludes and marijuana into a van to be brought to the docks. Along the way, they stopped at the police station and Gil was able to retrieve eight packages of the confiscated marijuana.
 
 
 13
 At the docks, the boxes of pills were loaded into boats provided by Carlos Coronel. However, there was not enough room for the marijuana from the DC-3 as well as the marijuana from the other plane. Since the other marijuana seemed to be of better quality, those packages were loaded onto the boat and Coronel set off for Miami. The other packages were stored in the Buccaneer Hotel in Bimini. Sosa, Ortega, and Rodriguez stayed overnight in the hotel. Later that afternoon, a gang tried to steal the marijuana from the hotel and when the police came to break up the crowd, they confiscated the marijuana. This time, however, Gil could not get the seized marijuana back. Back in Miami, Rodriguez delivered two boxes of pills to Robert Leavitt at his house.
 
 6. April 1981--Counts XII & XIII
 
 14
 In April, Gil planned another shipment using the DC-3 and Coronel's boats. This time they planned to import methaqualone powder instead of tablets. Russell Crump flew down to Colombia and David Catena, another pilot, flew as a passenger. Catena was the only one who knew the coordinates of the landing strip in Colombia and the individuals with whom they dealt. After they picked up the shipment of quaaludes and were on the way back to Bimini, Crump was told by radio to try to land without lights. When the plane landed, everyone on the plane was arrested. Catena told everyone to relax and that everything would be all right. The men were placed in jail overnight but were released the next day after Gil paid a fine. After this incident, Gil decided to move his operation to the West End in Freeport.
 
 
 15
 The first shipment to come into the West End was in April 1981. Gil planned the shipment with De Armas, Sosa, Ortega, and Rodriguez. After a delay due to mechanical problems with the plane, the shipment came in and was loaded onto a boat supplied by Coronel. De Armas, who owned the load, was upset because Coronel had only supplied one boat instead of two. De Armas was worried that if that boat was confiscated, the whole load would be lost. Gil reassured De Armas that he had faith in Coronel because he had never lost a load for him. However De Armas' fears were later realized when Coronel claimed that he lost the load on the way to Miami in bad weather. De Armas was upset about the loss of his load and threatened to kidnap Coronel to find out what really happened. Gil and Rodriguez calmed De Armas down.
 
 7. May 1981--Counts XIV & XVI
 
 16
 In the meantime, Gil was organizing another shipment for May 1981. He arranged with Andres, Coronel, Ortega, Sosa, Garces and Rodriguez for the Queen Air plane to fly in another shipment. On this trip, on Mother's Day, the plane was flown by Catena and the shipment was brought to Miami by Coronel. Rodriguez then delivered several boxes to Leavitt and Garces. He received $10,000 from Leavitt.
 
 
 17
 Again in late May, Rodriguez was sent by Gil to the West End to assist Ortega and Sosa in offloading another shipment flown in again by Catena. They loaded the shipment into Coronel's boat. Coronel brought the pills to Miami while Catena, Ortega and Rodriguez stayed in a hotel overnight. When the pills made it to Miami, Rodriguez delivered a box of pills to Perez.
 
 8. July 1981--Counts XVII & XVIII
 
 18
 In July 1981, John Crump and Martin Gil began dealing without Garces as a middleman. They set up a shipment of 650,000 pills which would be split between the two men. Jackson and a pilot named Bill Leslie flew the shipment back to the West End where Ortega loaded it into Coronel's boats. Coronel then stored some of the pills at his house. Several days later, in Miami, Jackson helped deliver part of the shipment to Crump and Leavitt. Later that day, however, Gil was arrested at his house and boxes of pills were confiscated. These pills were tested and determined to be methaqualone.9. August 1981--Counts XIX & XX
 
 
 19
 Jackson collected money from Leavitt and another coconspirator Jose Pastrana to pay for Gil's bond. At Pastrana's house, Jackson was introduced to a pilot whom he later identified as Catena. Within a few days Gil was out of jail and back in operation. In August, he planned for another shipment of quaaludes to be flown to the West End. Rodriguez and Catena unloaded the boxes and loaded them onto the speedboats.[3] The shipment never made it to Miami; they were later told that the merchandise had been lost near West Palm Beach.
 
 
 20
 Later in August, Gil and his group got more daring and decided that Jackson would fly a shipment straight to the United States from Colombia. In Colombia, however, the Colombians followed a somewhat different procedure--all the boxes were opened so that the pilots could see the pills. Jackson flew back to the United States and landed near Naples, Florida. When they landed, Jackson, Leslie, Rodriguez, and Ortega were arrested and thirteen boxes of pills were confiscated. The charges were dropped, however, because the tablets did not turn out to be methaqualone.
 
 10. October 1981--Count XXI
 
 21
 Finally, in October 1981, Johnny Crump and Gil arranged for another shipment. On this mission, the Colombia connection, Guillot-Lara, wanted the Americans to supply him with guns. Although Garces bought the guns, Gil decided not to send them but sent Rodriguez down to Colombia to explain why there were no guns. The Colombians became angry and only gave the pilots marijuana instead of the quaaludes they expected. They flew this shipment back to the Bahamas where Ortega helped Rodriguez unload it. However, when they could not find a way to transport the marijuana to the States, Rodriguez tried to store the shipment. He was subsequently arrested by the Bahamian police.
 
 B. THE INDICTMENT
 
 22
 The indictment contained twenty-two counts and named seventeen defendants, eight of whom are appellants in this case. Two counts of the indictment charged conspiracies. Count I of the indictment charged Ortega, Garces, De Armas, Coronel, Catena, Sosa and Perez[4] with a conspiracy to import methaqualone and marijuana into the United States between December 1980 and October 1981. Count II charged Coronel, Garces, Leavitt, and Perez with conspiracy to possess with intent to distribute methaqualone between December 1980 and July 1981. The other nineteen counts charged the various defendants with substantive acts of importation, attempted importation, and possession of methaqualone or marijuana. The counts are arranged in chronological order.
 
 
 23
 The defendants were charged and convicted of the following offenses. Ortega was convicted of the conspiracy to import marijuana or quaaludes. (Count I). He was also convicted of charges relating to every shipment or attempted shipment Gil made between December 1980 or October 1981. Eight of the counts are for successful importation of quaaludes from shipments in December, January, February, March, May, June, July, August and October. (Counts V, VII, VIII, X, XIV, XVI, XVII, XIX and XXI). The three counts of attempted importation of quaaludes relate to the unsuccessful ventures in January, April, and August of 1981 (Counts VI, XII, XIII, and XX). Finally, he was convicted of a successful importation of marijuana and an attempt to import marijuana (Counts IX and XI).
 
 
 24
 Coronel was convicted of the two conspiracies. (Counts I and II). In addition, he was convicted on three counts for the events in March: one count of importing quaaludes, one count of importing marijuana, and one count of attempting to import marijuana. (Counts IX, X, and XI). He was also convicted of two attempts to import quaaludes in April (Counts XII and XIII) and three subsequent successful importations of quaaludes in May, June, and July (Counts XIV, XVI, and XVII). Finally, he was convicted of possession with intent to distribute methaqualone resulting from the July shipment. (Count XVIII).
 
 
 25
 Garces was convicted of the two conspiracies. In addition, he was convicted of importing quaaludes and marijuana in December and possession with intent to distribute that shipment. (Counts III and IV). He was also convicted of two counts stemming from the March shipments on the DC-3: importation of quaaludes and attempted importation of marijuana. (Counts X and XI). In addition, he was convicted of importing marijuana in May. (Count XV).
 
 
 26
 Sosa was convicted of the conspiracy to import (Count I). He was also convicted of three counts relating to the March shipments: importation of quaaludes and marijuana and attempted importation of marijuana. (Counts IX, X, and XI). Finally, he was convicted of two counts of attempted importation of quaaludes in April and two counts of successful importation of quaaludes in May and June. (Counts XII, XIII, XIV, and XVI).
 
 
 27
 Catena was convicted of conspiracy to import, an attempt to import quaaludes in April, and two successful importations in May. (Counts I, XII, XIV, and XVI). Perez was convicted of the two conspiracies and a substantive importation in May. (Counts I, II, and XVI). De Armes was convicted of the conspiracy to import and two attempts to import quaaludes in January and April. (Counts I, VI, and XIII). Finally, Leavitt was convicted of conspiracy to possess with intent to distribute methaqualone and marijuana and possession. (Counts II and XIII).
 
 II. ISSUES ON APPEAL
 
 28
 The appellants raise various issues on appeal. Several of the appellants raise questions about the sufficiency of the evidence. Appellants Garces, De Armes, Sosa, and Perez argue that the evidence was insufficient to prove that the substance that was imported was methaqualone. Catena argues that the evidence was insufficient to prove that he knew that the destination of the quaaludes was the United States. Finally, Coronel and Ortega challenge the sufficiency of the evidence on all of the substantive counts for which they were convicted.
 
 
 29
 Several of the appellants challenge evidentiary rulings of the district court. Leavitt argues that evidence that he was present at Ortega's house when it was being searched was inadmissible. De Armas, Garces, Sosa, and Perez argue that the trial court erroneously admitted evidence that De Armes threatened to kidnap Coronel and that Garces agreed to send guns to the Colombians. They also contend that trial court unconstitutionally limited their right to cross-examine the government witnesses. Finally, Catena argues that the trial judge erroneously denied his motions for severance. We address these issues in turn.[5]
 
 III. SUFFICIENCY OF THE EVIDENCE
 
 30
 When considering whether the evidence is sufficient to sustain a conviction, we must consider the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). All reasonable inferences and credibility choices must be made in the government's favor. Id. The evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Bell, 678 F.2d 547, 549 (5th Cir.1982) (en banc), aff'd, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). With this standard in mind, we address the appellants' arguments.A. IDENTITY OF THE PILLS
 
 
 31
 Appellants De Armas, Garces, Sosa, and Perez[6] argue that the evidence was insufficient to prove that the substance that was imported was methaqualone. This court has held that the government need not introduce evidence of a chemical analysis for a jury to find that a substance was a controlled substance; instead it may rely on circumstantial evidence. United States v. Cole, 755 F.2d 748, 761 (11th Cir.1985); United States v. Harrell, 737 F.2d 971, 978 (11th Cir.1984), cert. denied, 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 781 (1985); United States v. Sanchez, 722 F.2d 1501, 1506 (11th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984); United States v. Crisp, 563 F.2d 1242, 1245 (5th Cir.1977); United States v. Quesada, 512 F.2d 1043 (5th Cir.1975). In this case, the government's proof was sufficient for a reasonable juror to find that the pills that were imported contained methaqualone.
 
 
 32
 First, the government introduced evidence that the pills seized from Gil's house after the July importation were chemically tested and identified as methaqualone. See Cole, 755 F.2d at 761. The government presented sufficient circumstantial evidence to support a finding that the other shipments contained methaqualone. For example, Rodriguez testified that on one occasion, Garces ingested a pill and later approved of the quality of the merchandise. See Crisp, 563 F.2d at 1244. Moreover, Detective Askew of the Miami Dade Police Department testified that he believed that the pills confiscated from Ortega's house were methaqualone and Inspector Cunningham of the Royal Bahamian police testified that the pills contained in the January shipment[7] contained methaqualone. Cf. Sanchez, 722 F.2d at 1506. In addition, John Crump, Rodriguez, Russell Crump and Jackson, who were admitted drug smugglers and active participants in various stages of the importation scheme, testified that they believed they imported methaqualone. See Cole, 755 F.2d at 761. They testified that the participants on each occasion believed that the pills contained methaqualone and referred to the shipment accordingly. See Harrell, 737 F.2d at 978; Sanchez, 722 F.2d at 1506. The cargo was treated consistently with its characterization as contraband: the shipments were flown into the Bahamas at night and clandestinely loaded into speedboats to be brought into the United States. The pills were then distributed in the United States for an amount of money that was consistent with the price of methaqualone. For example, John Crump testified that Garces paid him $60,000 for the June shipment which was consistent with the market price for quaaludes at the time. See Cole, 755 F.2d at 761. This evidence is sufficient for a reasonable jury to find that the substance imported was methaqualone.
 
 
 33
 The appellants point out, however, that the shipment which was seized in Naples, Florida did not contain methaqualone. Since both Rodriguez and Jackson testified that they thought the load contained methaqualone, the appellants argue that the evidence was insufficient to find that the substance in the other shipments was methaqualone. The appellants' argument misses the point. First, one shipment was positively identified as methaqualone. In addition, there was some testimony that the procedure in Colombia on the Naples shipment was somewhat different than the other trips. In light of this evidence, we do not think it unreasonable for the jury to have inferred that all the other shipments except the Naples shipment included methaqualone. As the court held in Bell, the evidence need not exclude all other possibilities except guilt, it need only convince a reasonable jury of guilt. In this case, a reasonable juror could find that the shipments contained methaqualone.
 
 B. DESTINATION OF THE PILLS
 
 34
 Catena argues that the government failed to prove beyond a reasonable doubt that he knew that the drugs were intended to be brought into this country. Catena asserts that the government only proved that he agreed to import quaaludes into the Bahamas which violated neither American or Bahamian law.
 
 
 35
 In order to convict Catena for conspiracy to import, the government had to prove that Catena knew that the drugs were intended for the United States. United States v. Champion, 813 F.2d 1154, 1169 (11th Cir.1987); United States v. Bollinger, 796 F.2d 1394, 1405 (11th Cir.1986), modified on other grounds, 837 F.2d 436 (1988); United States v. Bascaro, 742 F.2d 1335, 1361 (11th Cir.1984), cert. denied, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985); United States v. Corbin, 734 F.2d 643, 650 (11th Cir.1984); United States v. Conroy, 589 F.2d 1258, 1271 (5th Cir.), cert. denied, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979). Proof that the defendant knew the drugs were to be imported may be shown through direct or circumstantial evidence. Champion, 813 F.2d at 1169.
 
 
 36
 Catena does not dispute that on three separate flights he brought large quantities of quaalude pills to the Bahamas. Instead he argues only that the evidence was insufficient to find that he knew the pills would be brought into the United States. In this case, there was sufficient circumstantial evidence for the jury to find that Catena knew of the ultimate destination. First, Rodriguez testified that he was present when Catena spoke with Gil at his house in Miami and that the conversation generally involved importing drugs. Jackson also testified that he met Catena at the home of a coconspirator. Second, on the first flight Catena flew as a passenger, he was the individual entrusted with the location and identity of the Colombian source. Moreover, during that trip, when it became clear that those on the plane would be arrested, Catena reassured them that everything would be all right. This evidence supports an inference that Catena was an integral and trusted member of the conspiracy and therefore that he knew the ultimate destination of the shipments.
 
 
 37
 In addition, Catena's close interaction with the coconspirators who were responsible for loading the shipments onto boats supports a finding that he knew that the pills were to be brought to the United States. See Bollinger, 796 F.2d at 1405. The evidence shows that on each delivery he made, Catena aided Ortega and others with the unloading of the plane. Although the evidence is unclear as to whether Catena helped load the boxes onto the boats on those occasions, the evidence does establish that on at least one occasion, Catena stayed overnight in a hotel room with Ortega and Rodriguez after they had loaded the boats. See Champion, 813 F.2d at 1168-69; Corbin, 734 F.2d at 652. Moreover, Rodriguez testified that Catena helped him load the August shipment--which he did not fly in--onto the boats. Finally, the massive quantities of quaaludes flown in on each trip--usually around one million pills--and the testimony that there was no market for the pills in the Bahamas support a finding that Catena knew that the pills were headed for the United States. See Bascaro, 742 F.2d at 1360.
 
 C. CORONEL
 
 38
 Coronel challenges his conviction for all substantive counts. He first argues that there was no evidence to support a finding that Coronel knew that he was importing methaqualone. To sustain his conviction, however, the government need not prove that Coronel actually knew that the substance involved was methaqualone as long as he knew he was importing a controlled substance. United States v. Lewis, 676 F.2d 508, 512 (11th Cir.), cert. denied, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982). The evidence showed that Coronel participated in several discussions in which the delivery of the drugs was planned, he ferried several of the loads in his speedboats, and stored some of the loads at his house. His involvement therefore supports a finding that Coronel knew that contraband was involved, even if he did not know that the contraband was methaqualone.
 
 
 39
 Coronel also argues that there was insufficient evidence to support his convictions for three substantive offenses arising out of the March trip. (Counts IX, X, XI). He contends that the evidence shows only that one importation of marijuana occurred and that the evidence did not establish that any importation of quaaludes occurred. In fact, the evidence supports his conviction for three different offenses. Rodriguez testified that while he, Gil, and Ortega were waiting for the DC-3 to arrive with marijuana and quaaludes, another small plane touched down and dropped off sixteen packages of marijuana. Those packages were confiscated by the police but Gil later retrieved eight of the boxes. The DC-3 subsequently arrived laden with quaaludes and marijuana. When loading Coronel's boat, however, they were only able to put the newly acquired marijuana and the boxes of quaaludes on the boat. They therefore stored the marijuana from the DC-3 in the Bucaneer Hotel but that marijuana was later seized by the police. The evidence was sufficient to convict Coronel of Count IX for the successful importation of the marijuana from the other plane, Count X for the successful importation of the quaaludes and Count XI for the unsuccessful attempt to import the marijuana from the DC-3.
 
 
 40
 Likewise, it is clear that the evidence was sufficient to convict Coronel on the remaining counts. Counts XII and XIII related to the two unsuccessful attempts to import quaaludes in April. Rodriguez testified that the group tried to bring a shipment into Bimini but was unsuccessful because those on the plane were arrested. Although the testimony did not establish that Coronel supplied the boats for this attempt, Rodriguez testified that Coronel was present at the planning meetings. Since Coronel was charged as an aider and abettor, the government only had to prove that he voluntarily associated himself with the enterprise and sought to make the crime succeed. United States v. Collins, 779 F.2d 1520, 1528 (11th Cir.1986). In light of Coronel's prior and subsequent involvement, the jury was entitled to infer that Coronel sought to make the first April shipment succeed.
 
 
 41
 The evidence clearly supports a conviction for Count XIII relating to the second attempt in April out of the West End. Rodriguez testified that the DC-3 brought in a shipment of quaaludes that was loaded onto a boat supplied by Coronel. This was the shipment that Coronel told De Armas and Gil that he lost when he ran out of gas near the beach. Finally, the evidence was sufficient to convict Coronel on Count XVII for importing quaaludes in July and Count XVIII for possessing with intent to distribute that load of quaaludes. Rodriguez testified that he and Ortega loaded the July shipment of quaaludes onto Coronel's boat and that he was later sent by Gil to Coronel's house to retrieve the shipment.
 
 D. ORTEGA
 
 42
 Ortega argues that the trial court erroneously allowed Rodriguez to testify as to conversations that allegedly took place without requiring him to specify who made particular statements. He argues that this allowed the jury to convict him on all counts without finding that he was a knowing participant in the importation scheme. This argument is without merit. Although Rodriguez testified only as to the general topic of conversation and identified those who were present, that testimony represented only a small part of his testimony. Rodriguez testified in detail as to each act of importation and identified the participants and their responsibilities. He testified that Ortega was present and supervised the unloading of every shipment for Gil. Thus even if Rodriguez's testimony as to the conversations was vague, his testimony concerning Ortega's involvement in the particular charged acts was sufficient to support Ortega's conviction on the substantive counts. Moreover, Ortega's active participation in each shipment combined with his presence at meetings about future shipments entitled a reasonable jury to convict him of the substantive counts as well as the conspiracy to import.
 
 IV. EVIDENTIARY RULINGS
 A. RULE 404(b) CLAIMS
 
 43
 Leavitt argues that the trial court erroneously admitted testimony that he was present at Ortega's house while the police searched the house pursuant to a warrant. Appellants Garces, De Armas, Sosa, and Perez contend that the trial court erroneously admitted testimony that De Armas threatened to kidnap Coronel and that Garces bought guns to send to Colombia. The appellants argue that the evidence constituted extrinsic evidence under Federal Rule of Evidence 404(b) and should not have been admitted because the government did not give them notice of its intent to use the evidence as required by the discovery order and because the prejudice outweighed the probative value.
 
 
 44
 This evidence is not extrinsic evidence which was admissible only for one of the purposes specified in rule 404(b). Instead, the evidence was admitted as evidence of acts in furtherance of the conspiracy. Evidence of criminal activity other than the offense charged is not extrinsic evidence under rule 404(b) if it is inextricably intertwined with the evidence of the charged offense or is necessary to complete the story of the charged offense. United States v. Meester, 762 F.2d 867, 877 (11th Cir.1985); United States v. Montes-Cardenas, 746 F.2d 771, 780 (11th Cir.1984); United States v. Weeks, 716 F.2d 830, 832 (11th Cir.1983). Acts in furtherance of the conspiracy fall within this category. Collins, 779 F.2d at 1532.
 
 
 45
 The testimony showed that Leavitt arrived at Ortega's house shortly after the Mother's Day shipment and that the pills from that shipment were being stored there. Thus, Leavitt's appearance was an act in furtherance of the conspiracy to distribute the quaaludes. Likewise, the evidence that De Armas threatened to kidnap Coronel and that Garces agreed to trade guns for quaaludes are not extrinsic evidence because it was necessary to complete the story of the charged offenses. See United States v. Williford, 764 F.2d 1493, 1499 (11th Cir.1985); United States v. Leichtman, 742 F.2d 598, 604 (11th Cir.1984). The testimony about the threatened kidnapping explained the aftermath of the lost April shipment and was evidence of the interaction between several members of the conspiracy. The testimony about the guns likewise explained why the Colombians only sent marijuana back in the October shipment. Since these acts are not 404(b) evidence, the government was not required to give the defendants' notice of their intention to use them. Furthermore, the admissibility of such evidence is left to the sound discretion of the trial court. Collins, 779 F.2d at 1531. We find no abuse of discretion.
 
 B. LIMITS ON CROSS-EXAMINATION
 
 46
 Appellants De Armes, Sosa, Perez, and Garces argue that the district court placed limits on the bounds of cross-examination of the government witnesses that violated the Sixth Amendment. The district court did not allow defense counsel to ask Jackson questions about crimes that were committed before 1971 and about a judgment for $69,000 that Jackson never paid. The court did not allow defense counsel to ask Rodriguez questions about discussions he had with his attorney relating to his plea agreement. Finally, the court would not allow counsel to ask John Crump questions about drug deals that he allegedly transacted with Cuban government officials.
 
 
 47
 These restrictions did not violate the Sixth Amendment. The sixth amendment does not require unlimited cross-examination. See Delaware v. Van Arsdall, 475 U.S. 673, 679-680, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). A court may restrict cross-examination so long as the jurors receive sufficient information to assess the credibility of the witness. United States v. De Parias, 805 F.2d 1447, 1452 (11th Cir.1987). Thus a limitation on cross-examination does not violate the sixth amendment unless the excluded testimony would have affected the jury's impression of the witness' credibility. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. at 1436; De Parias, 805 F.2d at 1453. In this case, the appellants were given ample opportunity to cross-examine the government witnesses. The cross-examination of these witnesses takes up several volumes of the record. Counsel extensively examined all four witnesses about their plea agreements and their motivation for testifying. The questions which the trial judge would not allow to be asked were merely cumulative or of dubious relevance. Thus, no constitutional violation occurred.
 
 V. CATENA'S MOTION FOR SEVERANCE
 
 48
 Catena argues that the failure to sever his trial denied him of due process. Catena moved for severance before trial pursuant to Rule 14 of the Federal Rules of Criminal Procedure. That motion was denied. Rule 14 of the Federal Rules of Criminal Procedure allows a court to order separate trial if it appears "that a defendant ... is prejudiced by a joinder of offenses or of defendants." A motion for severance is entrusted to the sound discretion of the trial judge and will only be reversed on a showing of an abuse of discretion. United States v. Van Horn, 789 F.2d 1492, 1505 (11th Cir.1986). To establish an abuse of discretion, the appellant must demonstrate that he was unable to receive a fair trial and suffered compelling prejudice. Id. Compelling prejudice requires proof that the jury could not follow the trial court's instructions and separate the evidence relevant to each appellant. United States v. Dorsey, 819 F.2d 1055, 1058 (11th Cir.1987); Meester, 762 F.2d at 884. In a conspiracy case, coconspirators should usually be tried together; the fact that a defendant only participated in one aspect of the conspiracy does not by itself warrant severance. United States v. Pepe, 747 F.2d 632 at 650-51 (11th Cir.1984). Instead, it is presumed that cautionary instructions to the jury to consider the evidence separate as to each defendant will adequately guard against prejudice. United States v. Kopituk, 690 F.2d 1289, 1320 (11th Cir.1982). In this case, the trial judge gave such cautionary instructions periodically throughout the trial. Since Catena has not made a specific showing that the jury was unable to compartmentalize the evidence, the trial court did not err in denying the pretrial motion for severance.
 
 
 49
 Catena also moved for severance on the last day of trial under Byrd v. Wainwright, 428 F.2d 1017 (5th Cir.1970), on the grounds that he needed codefendant Leavitt's testimony. Leavitt was called to the stand and proffered testimony that Catena bore a striking resemblance to another pilot named David Turner and that he had seen Gil and Turner together at the Tamiami Airport during the time covered by the indictment. Catena's argument was that Wilbur Jackson had misidentified him as David Turner.[8] This motion was denied on the grounds that the evidence he sought to present was not exculpatory, was available from other sources, and was untimely. Catena argues that this was reversible error.
 
 
 50
 In Byrd v. Wainwright, 428 F.2d 1017 (5th Cir.1970), this court held that in order to obtain a severance based on a desire for a codefendant's testimony, a defendant must demonstrate: (1) a bona fide need for the codefendant's testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) that the codefendant will actually testify. If a showing is made, the district court must then consider the significance of the testimony, the prejudice caused by the absence of the testimony, the timeliness of the motion and the effect on judicial administration and economy of resources. Pepe, 747 F.2d at 651 n. 20; Bollinger, 796 F.2d at 1402. The judge's ruling is reviewed only for an abuse of discretion. Bollinger, 796 F.2d at 1403.
 
 
 51
 We do not believe the district court abused its discretion in denying the motion for severance. The evidence was not exculpatory; Leavitt's testimony at most would have impeached Jackson's identification of Catena. Leavitt did not agree to testify that Turner was actually the pilot on any of the flights. See United States v. Bovain, 708 F.2d 606, 608 (11th Cir.), cert. denied, 464 U.S. 898, 104 S.Ct. 251, 78 L.Ed.2d 238 (1983). More important, however, Jackson only testified that he met Catena at a coconspirator's house and was told that he was one of the pilots. On the other hand, Rodriguez testified that Catena was involved in the three shipments for which he was charged. Moreover, the evidence concerning Turner's physical description was readily available from other sources. This fact enhances the untimeliness of the motion which was filed on the day that closing arguments were scheduled. See Pepe, 747 F.2d at 651; Bovain, 708 F.2d at 611. In light of these factors, the district court did not abuse its discretion in denying the motion to sever.
 
 VI. CONCLUSION
 
 52
 We therefore find that the evidence was sufficient to establish that the substance that was imported was methaqualone and that Catena knew that the shipments were destined for the United States. Moreover, the evidence was sufficient to convict Coronel and Ortega on all the counts with which they were charged. Finally, the trial court did not abuse its discretion in any of the evidentiary rulings challenged on appeal or in denying Catena's motions for severance. Accordingly, the appellants convictions are AFFIRMED.
 
 
 
 [1]
 According to the government Gil was originally indicted but was not named in the superseding indictment because he had been killed in a boating accident
 
 
 [2]
 Sam was released by the Bahamian police within a week or two after his arrest
 
 
 [3]
 Rodriguez testified that Catena did not fly this shipment in but merely helped with the offloading process
 
 
 [4]
 We omit references to other individuals indicted in the various counts not appellants in this case
 
 
 [5]
 The other issues raised by Ortega in his pro se brief are without merit
 
 
 [6]
 To the extent that Coronel's arguments on the sufficiency of the evidence challenge the proof that the pills actually were methaqualone, this discussion is relevant to him as well
 
 
 [7]
 This was the shipment for which pilots Sam and Roberto were initially arrested
 
 
 [8]
 At the close of the government's case, Catena's counsel moved for a judgment of acquittal based on the misidentification of Catena by Jackson. The motion was denied because Rodriguez had also identified Catena as being the pilot on several of the flights