929 F.2d 702
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Leon C. LEWIS, Defendant-Appellant.
 No. 90-3604.
 United States Court of Appeals, Sixth Circuit.
 March 29, 1991.
 
 On Appeal from the United States District Court for the Southern District of Ohio, No. 89-00184, Smith, J.
 S.D. Ohio
 AFFIRMED.
 Before RYAN and SUHRHEINRICH, Circuit Judges, and SILER, Chief District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 Defendant-appellant Leon Lewis appeals his conviction on an eleven-count indictment for storing, manufacturing, possessing, and distributing cocaine. We must decide
 
 
 2
 --Whether the trial court committed reversible error by overruling Lewis's motion for a new trial based on newly discovered evidence, and
 
 
 3
 --Whether the trial court committed reversible error by admitting testimony concerning Lewis's arrest in Florida and the seizure of his money in the Dayton airport.
 
 
 4
 We believe the district court committed no error and, therefore, we shall affirm.
 
 I.
 
 5
 On July 26, 1989, Leon Lewis was arrested after leaving 3094 Compton Drive in Columbus, Ohio, where a delivery of eight kilograms of cocaine had been made earlier that day by the Columbus police. On August 31, 1989, Lewis was indicted in an eleven-count indictment charging him with conspiracy to distribute and possess with the intent to distribute over five kilograms of cocaine, in violation of 21 U.S.C. Sec. 846 (Count 1); maintaining a residence to unlawfully store cocaine, in violation of 21 U.S.C. Sec. 856(a)(2) and 18 U.S.C. Sec. 2 (Counts 2, 3, and 9); travelling in interstate commerce to promote an unlawful drug business, in violation of 18 U.S.C. Sec. 1952 (Count 4); unlawful distribution of cocaine, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2 (Counts 5, 6, 8, and 10); money laundering, in violation of 18 U.S.C. Secs. 2 and 1956 (Count 7); and attempting to possess eight kilograms of cocaine with the intent to distribute, in violation of 21 U.S.C. Sec. 846 (Count 11).
 
 
 6
 At trial, the jury convicted on all eleven counts. The evidence rested largely on the testimony of two witnesses, Laura Payne Lassiter and Tyrone Eaton.
 
 
 7
 Lassiter testified that she had known Lewis for four years and that he had been a customer of her boyfriend, Tony Barberia, who distributed cocaine. Lassiter stated that she became involved in the cocaine business through Barberia and took over his business when he was arrested in 1986. In the fall of 1986, Lewis and Lassiter became partners--pooling their money to purchase cocaine in Florida. Lassiter testified that they bought one to two kilos from Barberia's family on four or five separate occasions through early 1987.
 
 
 8
 In 1987, Lewis and Lassiter began purchasing cocaine from two new sources. On five or six occasions, Lewis bought a kilogram of cocaine from Harold, a Florida source. Lewis then sold the cocaine to Lassiter. Lewis also began purchasing cocaine from Uncle Charlie, a California source. Lewis sold Lassiter four to six kilograms of the cocaine he purchased from Charlie. Lassiter testified that their partnership began to dissolve in 1987. Lassiter continued to buy cocaine from Lewis but also relied upon other sources.
 
 
 9
 Lassiter testified that she leased two apartments, 2382 Parkgreen Place and 5502-A Palmira Way, to store drugs. Lewis contributed to the rent and also used these apartments to store drugs. Lewis also used the Palmira Way address to cook cocaine into crack for his crack houses.
 
 
 10
 At the time of her testimony, Lassiter had been charged with several counts of narcotics trafficking. Pursuant to a plea agreement, she pled guilty to one count and the other charges were dropped in exchange for her testimony against Lewis and another co-conspirator, John Watson, who was tried separately. The government also agreed to ask for a downward departure at sentencing. Lassiter testified at Lewis's trial that she had been involved in drug trafficking from the summer of 1986 to August 1988.
 
 
 11
 During cross-examination, the defense asked Lassiter if, to her knowledge, Lewis had ever been "busted." Lassiter replied that he had not. On redirect, Lassiter recalled that Lewis had been stopped in the Dayton and Los Angeles airports and that money had been confiscated. On recross, counsel asked Lassiter if Lewis had ever been arrested. She answered that Lewis had told her that he had been arrested in Miami.
 
 
 12
 Tyrone Eaton also testified pursuant to a plea agreement. Eaton testified that he had known Lewis since childhood. Eaton began working for Lewis in July 1987 when Lewis asked him to travel to California to transport cocaine back to Columbus. Eaton made this trip in a van leased in the name of Laura Payne Lassiter. This trip was documented by hotel records and long distance telephone calls from Eaton's hotel to Lewis. Lewis met Eaton in Los Angeles and gave him the cocaine wrapped as birthday presents. Eaton was paid $1,500 by Watson and Lewis for this trip.
 
 
 13
 Eaton made a second trip to California to buy cocaine from Lewis for Watson in October 1987. This trip is documented by telephone calls between Watson's home and a phone issued to Lonnie Jackson, an alias used by Lewis.
 
 
 14
 Eaton also testified about local drug transactions involving Lewis. He stated that Lewis and Watson met in a restaurant parking lot and Lewis returned a half hour later and gave Watson a package. Watson had told him they were there to buy a kilogram of cocaine from Lewis. Eaton also testified that he worked for Lewis in two crack houses in 1987.
 
 
 15
 Lewis testified on his own behalf at trial. He acknowledged knowing Lassiter but denied discussing or dealing drugs with her. He also admitted knowing Eaton and loaning him the van leased by Lassiter but denied giving Eaton any packages on the trip. He also denied knowing anything about the packages of cocaine found at 3094 Compton.
 
 
 16
 On cross-examination, Lewis was asked about his source of income and explained that he was in the recording business and earned a great deal of money gambling. He admitted that he had not filed income tax returns for the years in question. He further stated that he was in the process of taking care of his taxes and had no intent to defraud the government, as he was a "law abiding citizen." In response to his claim of being a "law abiding citizen," the government asked Lewis whether he had ever purchased a kilogram of cocaine. Lewis admitted buying a kilogram from an undercover policeman but took the Fifth Amendment when asked if the officer was Harold Brown, the supplier identified earlier by Lassiter.
 
 
 17
 After his conviction, on April 6, 1990, Lewis filed a Motion for New Trial Based on Newly Discovered Evidence, alleging that Lassiter had perjured herself to Lewis's detriment. On May 22, 1990, Lewis filed an Amended Motion for New Trial based on an affidavit by Tyrone Eaton recanting his testimony in John Watson's trial.
 
 
 18
 On January 30, 1990, a hearing was held on Lewis's motions. David Watson, John Watson's attorney, testified that Eaton had approached him about making an affidavit concerning his testimony at Watson's trial. Watson counseled Eaton to consult an attorney due to possible prosecution for perjury if he executed the affidavit. Eaton returned to Watson's office a week later and executed an affidavit stating that he was involved in the cocaine business with Leon Lewis. He denied Watson's involvement.
 
 
 19
 Eaton testified at the hearing that his trial testimony was true and that the affidavit was false. He also stated that his testimony at Lewis's trial was true. Eaton stated that he executed the affidavit in response to an anonymous late night telephone call warning him "to straighten out the lies he told on Johnnie (Watson) or else." Eaton had also received a number of late night calls in which the caller had hung up. He hoped that by executing the affidavit the pressure would be off him and that Watson would get a new trial in which Eaton would not be used as a witness. The government attorney assigned to the case had promised Eaton that if he told the truth, he would not be charged with perjury.
 
 
 20
 Lewis also called a detective from the Franklin County Sheriff's Department who testified that on February 7, 1990, he arrested Laura Lassiter when, executing a search warrant, he caught her trying to pour 900 kilograms of cocaine into the toilet. The police seized $89,000 during the raid. Lassiter was indicted on six counts relating to drug violations occurring in January and February 1990.
 
 
 21
 The district court denied the Motion for New Trial, finding that the newly discovered evidence regarding credibility was cumulative. The court stated that Lewis could submit further testimony from Teresa Watson, John Watson's wife, if he was later able to locate her.
 
 
 22
 On June 29, 1990, Lewis submitted a Motion to Reconsider the district court's denial of his Motion for New Trial to which he attached a transcript of testimony from Teresa Watson. Teresa Watson stated that Eaton had contacted her in April 1990 regarding lies he had told in Watson's trial and his desire to set things straight. Ms. Watson also testified that government attorneys told Eaton that he should go back to his original testimony because of perjury charges. The motion was once again denied.
 
 II.
 A. Denial of Motion for New Trial
 
 23
 Lewis contends that the trial judge abused his discretion in denying his Motions for New Trial based on Eaton's recantation of his testimony at Watson's trial and his retraction of the recantation and Lassiter's perjuring herself at trial by testifying that she had been involved in drug trafficking from 1986-88 but was subsequently arrested for drug activity occurring at the time of trial. Lewis argues that without credible testimony from Lassiter and Eaton, the government's case falls apart as the other evidence corroborated Lassiter's and Eaton's activities but only Lassiter and Eaton tied Lewis to the crimes. The government, on the other hand, asserts that the challenges to Lassiter's and Eaton's testimony go only to impeachment and credibility and thus, as a matter of law, are insufficient to warrant a new trial.
 
 
 24
 "Motions for a new trial are not favored and are granted only with great caution." United States v. Garner, 529 F.2d 962, 969 (6th Cir.), cert. denied, 429 U.S. 850 (1976); see also United States v. Adi, 759 F.2d 404, 407 (5th Cir.1985). The district court's denial of such a motion will only be disturbed when the movant demonstrates a clear abuse of discretion. United States v. Allen, 748 F.2d 334, 337 (6th Cir.1984); Adi, 759 F.2d at 407. The burden of proof on a motion for new trial based on new evidence rests on the movant. See United States v. Handy, 351 U.S. 454 (1956). To sustain this burden, the movant must show that the evidence:
 
 
 25
 (1) was discovered after trial,
 
 
 26
 (2) could not have been discovered earlier by the exercise of due diligence,
 
 
 27
 (3) is material and not merely cumulative or impeaching, and
 
 
 28
 (4) is likely to produce an acquittal if the case is retried.
 
 
 29
 United States v. Barlow, 693 F.2d 954, 966 (6th Cir.1982), cert. denied, 461 U.S. 945 (1983); Garner, 529 F.2d at 969. The district court found that Lewis demonstrated that the evidence was newly discovered and could not have been discovered earlier by the exercise of due diligence. He denied the motion, however, based on Lewis's failure to prove that the evidence was material, not merely cumulative and impeaching, and that it would produce an acquittal if he granted the motion.
 
 1. Eaton's Recantation
 
 30
 In May 1989, after testifying in the trials of both Watson and Lewis, Eaton executed an affidavit recanting his testimony in the Watson trial. The affidavit stated that Watson was not involved in drug trafficking and that Eaton's was involved with narcotics distribution solely through Lewis. The affidavit did not address the veracity of Eaton's testimony at Lewis's trial.
 
 
 31
 At a January 30 hearing on Lewis's Motion for a New Trial, Eaton testified that he executed the affidavit in response to a late night telephone call telling him to "straighten out the lies he told on Johnnie (Watson) or else." Eaton had received a number of other late night calls in which the caller immediately hung up. To take the pressure off himself, Eaton executed the affidavit. After executing the affidavit, two government attorneys told Eaton that he would not be charged with perjury if he testified truthfully at the January 30 hearing. At the hearing, Eaton testified that his trial testimony in both Watson's and Lewis's cases was truthful and that the affidavit recanting the testimony was false. Lewis also submitted the transcript of the testimony of Teresa Watson, John Watson's wife, attesting that Eaton had contacted her regarding his lies at Watson's trial and his desire to set things straight.
 
 
 32
 "Recanting affidavits and witnesses are viewed with extreme suspicion by the courts." Adi, 759 F.2d at 408. The test when reviewing such affidavit is:
 
 
 33
 If the District Judge, on the basis of the whole record of the original trial and the matters presented on the hearing of the motion, believes the statements in the affidavit of recantation to be false and is not reasonably well satisfied that the testimony given by the witness on the trial was false, the decision is for him to reach for he is "not at liberty to shift upon the shoulders of another jury his own responsibility but [is] charged with the responsibility to seek the truth himself."
 
 
 34
 Id. at 408-09 (quoting Newman v. United States, 238 F.2d 861, 863 (5th Cir.1956)). The trial judge is especially qualified to make this determination when he observed the testimony of the witness at the hearing and can contrast that testimony with the witness's trial testimony and the testimony of other witnesses. Id. at 409; see also Barlow, 693 F.2d at 966.
 
 
 35
 In the present case, the trial judge did not need to engage in a complicated weighing of conflicting testimony because Eaton retracted his recantation at the hearing. When a witness retracts a recantation, serious doubt arises over whether he meets the first part of the Barlow test, the discovery of new evidence, as the witness's "version of events remains exactly as it was at trial." United States v. Santiago, 837 F.2d 1545, 1550 (11th Cir.1988); see also United States v. Gaffney, 689 F.Supp. 1580 (M.D.Fla.1988). Even if Lewis's argument surpasses this first hurdle of the Barlow test, he still runs into trouble on the third and fourth hurdles.
 
 
 36
 To satisfy the third criteria, the movant must show that the evidence is material and not merely cumulative and impeaching. A recantation and retraction, however, only speak to a witness's credibility. Gaffney, 689 F.Supp. at 1584. This is especially true in the present case where even if the retraction is not truthful, the substance of the affidavit, that Lewis, but not Watson, was a drug trafficker, would not help build the defense's case on re-trial. It is well settled that evidence discrediting a witness's testimony but not directly contradicting the government's case, cannot be the basis for granting a new trial. Garner, 529 F.2d at 969; United States v. Solimine, 536 F.2d 703, 709 (6th Cir.) vacated on other grounds, 429 U.S. 990 (1976); Gaffney, 689 F.Supp. at 1584.
 
 
 37
 Finally, regardless of whether Eaton retracted his recantation, this "new evidence" does not satisfy the fourth requirement, likelihood of producing an acquittal. Eaton was cross examined extensively about his drug activities and his arrangement with the government; his credibility was questioned at trial and the jury still chose to convict Lewis. See Gaffney, 689 F.Supp. at 1584. Moreover, even if the affidavit and retraction so jeopardize Eaton's testimony as to make it completely incredible, the jury could still convict based on Lassiter's testimony, the testimony of other witnesses, and the hotel receipts and telephone logs documenting the trips he made for Lewis. Id. Finally, the unretracted affidavit also would not affect the outcome of trial because unlike the affidavits at issue in Gaffney, Santiago, and Adi, which were all insufficient to warrant a new trial, nothing in Eaton's affidavit exculpates Lewis nor casts doubt on the veracity of his testimony at Lewis's trial.
 
 
 38
 The trial judge, then, did not abuse his discretion in finding that Eaton's affidavit and retraction did not warrant granting a new trial.
 
 2. Lassiter's Subsequent Arrest
 
 39
 Lewis also contends that a new trial should be granted because Lassiter perjured herself at trial by indicating that she was no longer drug trafficking. Lewis argues that this information would have affected the jury's deliberation because "[t]he thrust of her testimony was that she had been charged, entered into a plea agreement and was now 'coming clean' as a result thereof." The government argues the subsequent arrest for drug trafficking merely constituted cumulative evidence of her involvement with narcotics, which she herself admitted on the stand.
 
 
 40
 Lassiter testified that she had been involved in narcotics distribution "[f]rom the summer of '86 to August of '88." Although this testimony created the impression that Lassiter had stopped dealing in drugs, the evidence of her subsequent arrest is cumulative evidence of her involvement in narcotics trafficking and is thus insufficient to warrant granting a new trial. Evidence of a witness's illegal activity does not warrant granting a new trial where, as in the present case, the defense's credibility attack at trial included evidence of past illegal activity. Jarrett v. United States, 822 F.2d 1438, 1445 (7th Cir.1987); United States v. Previte, 648 F.2d 73, 85 (1st Cir.1981). Both the prosecution and defense explored Lassiter's prior drug activities and her arrangement with the government. The evidence of her subsequent arrest would merely be cumulative. The evidence is also insufficient as it does not contradict the government's case but merely serves to impeach Lassiter's credibility as a witness. See Garner, 529 F.2d at 969.
 
 B. Evidentiary Objections
 
 41
 Lewis's second contention on appeal is that the lower court admitted testimony, in violation of Fed.R.Evid. 404(b), of Lewis's prior bad acts in order to show conduct conforming with such acts.
 
 
 42
 1. Evidence of Lewis's Stop in Dayton, Ohio Airport
 
 
 43
 Lewis argues that the district court committed reversible error in allowing testimony regarding the seizure of $19,600 by officers of the Dayton Police Department during a stop at the Dayton Airport on June 20, 1988. This evidence came before the court when defense counsel asked Lassiter if she knew whether Lewis, during the time of the conspiracy, had ever been "busted." Lassiter replied that he had not. The prosecution then questioned Lassiter regarding airport stops in Dayton and Los Angeles to show that Lewis had in fact been "busted." Lassiter's testimony, that Lewis had been stopped and money had been confiscated, was corroborated by Detective Hall of the Dayton Police Department Drug Trafficking Unit who testified that he stopped Lewis in the airport due to Lewis's conformance with a drug courier profile. When the police questioned him, Lewis lied to them about his travel plans: he told them that he had just flown in from New York where he earned the money promoting concerts and was on his way to Los Angeles to deliver the money to two friends. Lewis's ticket, however, indicated that his flight had originated in Columbus, Ohio, and would connect to Los Angeles in Dayton. Lewis was not arrested at the time, but the money was confiscated and subsequently forfeited to the government.
 
 
 44
 Lewis argues that this testimony was prejudicial and violative of Rule 404(b) because it focused on Detective Hall's assignment to the Drug Trafficking Unit and was not tied into the charges. We disagree.
 
 Fed.R.Evid. 404(b) provides that:
 
 45
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 46
 Count 1 charged that it was "part of the conspiracy that defendant LEON CURTIS LEWIS ... would obtain cocaine from Florida and California for further distribution at various locations in the Columbus, Ohio area." Count 4 charged that Lewis "did knowingly, wilfully and unlawfully travel in interstate commerce from Columbus, Ohio, to Los Angeles, California, with intent to further promote, manage and carry on an unlawful activity, that being a business enterprise involving narcotics in violation of the laws of the United States." Evidence, then, that Lewis carried a large sum of cash from Columbus to Los Angeles during the time of the conspiracy and that he lied to the police about the source of the cash was offered and received not as evidence of uncharged misconduct under Fed.R.Evid. 404(b), but to show Lewis's involvement in the conspiracy and his interstate travels to promote a narcotics business. In another narcotics case involving a Rule 404(b) challenge, the court commented that:
 
 
 47
 Evidence of criminal activity other than the offense charged is not extrinsic evidence under rule 404(b) if it is inextricably intertwined with the evidence of the charged offense or is necessary to complete the story of the charged offense ... Acts in furtherance of the conspiracy fall within this category.
 
 
 48
 United States v. Leavitt, 878 F.2d 1329, 1339 (11th Cir.), cert. denied, 110 S.Ct. 415 (1989) (citations omitted). This evidence, then, was proper to show Lewis's efforts in furtherance of a conspiracy involving the distribution in Columbus, Ohio, of narcotics obtained in Los Angeles and Lewis's interstate travel to promote this distribution.
 
 2. Arrest in Florida
 
 49
 Lewis also contends that reversible error occurred when the district court allowed testimony regarding his arrest in Florida for attempting to purchase a kilogram of cocaine from Harold Brown, an undercover policeman. After testifying on direct examination about his legitimate income from concert promoting, which supported his extravagant lifestyle, Lewis admitted on cross-examination that although he had not filed tax returns for the years in question, he was a "law abiding citizen." The prosecution then attempted to show that Lewis was not a "law abiding citizen" by asking whether Lewis had ever purchased a kilogram of cocaine. Id. The prosecution argues that this question and follow up questions regarding whether cocaine was purchased, and if so how much, and the dollar amounts involved were proper because Lewis opened the door by describing his legitimate business activities as the sole source of his vast income and by unequivocally stating that he was a "law abiding citizen." They also argue that defense counsel opened the door by asking Lassiter whether it was true that Lewis "had never been arrested other than this particular charge." Lassiter responded that Lewis had been arrested in Miami.
 
 Fed.R.Evid. 405(a) provides that:
 
 50
 In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
 
 
 51
 By stating that he was "a law abiding citizen," Lewis "opened the door" to questions relating to his past criminal conduct. Lewis may not have intended to place his good character at issue and thus trigger the application of Rule 405(a). His intent, however, is irrelevant. Lewis told the jury, in effect, that he always obeyed the law. The government, under Rule 405(a), was thus entitled to cross-examine him regarding specific acts of misconduct undermining his unequivocal claim of law abidedness.
 
 
 52
 Lewis also challenges the admissibility of evidence regarding the Florida arrest because he believes the government had promised him that they would cross-examine regarding the arrest only if Lewis denied "that he had ever had anything to do with cocaine or never agreed to buy cocaine." A complete reading of the transcript, however, indicates that the quoted passage involved a defense motion to suppress tape recordings of the Florida arrest. The prosecution responded that the motion was unnecessary as they did not intend to introduce the tapes in their case in chief and would only use them on cross-examination if Lewis completely denied that he had ever purchased cocaine. The prosecution did not state that it would not cross-examine Lewis regarding the Florida arrest, only that it would not use the tapes whose authenticity the defense challenged.
 
 III.
 
 53
 We conclude that the district court properly denied the defense's motion for a new trial and properly determined the evidentiary issues at trial. We therefore AFFIRM.
 
 
 
 *
 The Honorable Eugene E. Siler, Jr., Chief United States Judge for the Eastern District of Kentucky, sitting by designation